ELMER ROYCE, Plaintiff, v. JOHN B. ROSASCO, Individually and as Administrator of the Estate of JOHN E. ROSASCO, Deceased, Defendant.

Supreme Court, Oneida County, March 25, 1936.

*Miles W. Jones* [*Stephen R. Brennan* of counsel], for the plaintiff.

*Pratt & Fowler* [*Howard M. Rowe* of counsel], for the defendant.

SMITH (E. N.), J.   The plaintiff is a milk producer who has sold his milk to a milk receiving station owned and operated by defendants (hereinafter designated as " the defendant "); the action is brought to recover $342.21 damages on account of claimed underpayment of the amount due according to the price-fixing " Official Orders " of the Milk Control Board for milk delivered between May 16, 1933, to and including February, 1935.

The defendant is a milk dealer who owns and operates three milk receiving stations; one at Camden and one at Westdale, Oneida county, and one at Poland, Herkimer county, N. Y., which he has owned and operated for many years.   To the extent that the fluid

milk market would absorb it, he has sold this milk to other dealers, in the so-called Metropolitan area, for distribution to the consumer; whatever the fluid market will not take up he separates at the stations and sells the cream to manufacturers of milk products. He is not a distributor to individual consumers; he is a wholesaler. We are here considering dealer to dealer transactions.

The differences between the parties arise out of the price-fixing provisions of the Milk Control Law (Agriculture and Markets Law, art. 25, added by Laws of 1933, chap. 158, effective April 10, 1933, and repealed by Laws of 1934, chap. 319; Agriculture and Markets Law, arts. 21 and 21-A, added by Laws of 1934, chap. 126, effective April 1, 1934), the price-fixing orders adopted by the Milk Control Board set up in said law, and the administration thereof.

The plaintiff claims that the defendant has failed to comply with these price-fixing orders, to his damage in the sum of $342.21; in arriving at this figure he relies upon a schedule of alleged underpayments by the defendant to his producers, contained in the findings dated January 21, 1935, in a proceeding by the Milk Control Board to revoke defendant's license; these findings are attached to a conditional order dated January 22, 1935, revoking defendant's license unless he pay to his milk producers the sum of $55,333.32 before a date fixed. The defendant did not comply with this order. This schedule covered the milk purchased up to and including the month of September, 1934. The claimed underpayments, however, for the months of October, 1934, to February, 1935, both inclusive, are arrived at in the same manner as are the prices for the prior deliveries. There is no dispute as to the amount due the plaintiff if he is entitled to recover anything.

On its face this action is one brought by a single producer against a single so-called independent dealer; the plaintiff is really, though not formally, acting in behalf of 280 producers, and if the plaintiff recover here there would be laid the basis for a recovery not of $342.21 but of upwards of $64,000 against this dealer. It is also clear that the defendant, in his contentions here, is supported by other so-called independent dealers.

The action came on for trial before a jury; on the trial it soon became evident that there were no questions of fact for the consideration of a jury, but that there were many involved questions of law; upon stipulation, the jury was discharged, with the understanding that the issues at the close of the evidence would be raised by motions for nonsuit or directed verdict, as the circumstances might require.

The record is voluminous and reveals the facts necessary for a consideration of the grounds of the attack made by defendant on

the constitutionality of the law itself, the validity of the regulations adopted by the Milk Control Board and their legality and constitutionality as applied to dealers circumstanced as this defendant is.

The defendant claims illegalities which may generally be classified as follows:

(1) That certain of the price-fixing provisions of the law are unconstitutional.

(2) That the Milk Control Board, in adopting its official orders, did not comply with the provisions of the law itself in the following respects:

(a) As to notice of hearing, and

(b) As to the hearing itself.

(3) That in adopting its official orders regulating and fixing prices it exceeded its administrative power.

(4) That the effect of these laws and regulations is:

(a) To deprive the defendant of his property without due process of law, guaranteed by the Fourteenth Amendment to the Constitution of the United States and by section 6 of article I of the Constitution of the State of New York

(b) To deny him the equa' protection of the laws, as guaranteed to him as a citizen of the State of New York by said Fourteenth Amendment.

(5) That the price-fixing regulations operate as a confiscation of his property and their operation works a discrimination.

(6) That the price-fixing action of the Milk Control Board operates as a restraint of trade, in violation of the Anti-Trust Act of July 2, 1890 (U. S. Code, tit. 15, chap. 1, §§ 1–33; 26 U. S. Stat at Large, 209 *et seq.*, as amd.), and of the statutes of the State of New York (Gen. Bus. Law, art. 22, §§ 340–346) prohibiting monopolies and combinations in restraint of trade.

(7) That the emergency which was the occasion for the enactment of the price-fixing laws had ended before the time mentioned in the complaint, and that, the emergency having terminated, all control orders purporting to have been made by the Milk Control Board thereafter are illegal and void.

Thus this defendant has sought to bring into this action for the consideration of the court practically the whole realm of the operation of price-fixing laws and regulations of the State of New York, thus mixing in almost inextricable confusion questions of public policy, which are not for the consideration of the court, and questions of fundamental rights under law and constitutional provisions, which are.

The record here shows that we are considering here legislation and price-fixing regulations affecting the distribution of milk to something over 7,000,000 people in New York city and its surrounding territory, known herein as the Metropolitan area. Over 70,000 of the 100,000 dairy farmers in the State are prepared to serve this market; it was the financial distress of these farmers which caused the investigation by the Legislature of the State of New York which resulted in the legislation known as the Pitcher Bill or the price-fixing regulations of the Milk Control Law. The emergency was very real; it was not occasioned solely by the depression of 1930; at no time for years prior thereto had the dairy farmer been rece ving a fair proportion of the consumer's dollar. The absence of more than a casual examination of this subject is a conspicuous omission in said legislative report; but it does appear herein that the dairy farmers are carrying upon their shoulders the full burden of the cost of distribution, and that after all these costs, including operating expense, depreciation, management expense, taxes, insurance, interest, maintenance, cost of enforcement of health laws, rackets in distribution, profits and dividends to the dealers or their stockholders, the farmer got, irrespective of his cost of production, his depreciation, his taxes, his interest, his insurance and other expenses, to say nothing of profit, what was left. The causes of this situation are not here, but such was the condition, which was made acute and impossible of tolerance by the depression of 1930, and it was that acute condition which the legislation involved here sought in some measure to relieve.

The record does not disclose the exact percentage of the fluid milk market in the Metropolitan area which is supplied by three major organizations: the Dairymen's League Co-operative Association, Inc., which has a membership of some 55,000 producers; the Sheffield Farms, Inc., which receives the milk of some 15,000 producers, and the Borden Company, which, while having some milk stations of its own within the State, largely takes its fluid milk from the Dairymen's League Co-operative Association, Inc. Each of these three organizations has also out of State sources of milk supply. The balance of the milk supply for the Metropolitan area which is purchased inside the State of New York is supplied by so-called independent dealers, of which the defendant is one. These larger organizations, to the end that there may be at all times an adequate supply of fluid milk in the Metropolitan area, purchase more milk than the fluid milk market will take up, and manufacture the so-called " surplus " into cheese or other milk products, according as is most advantageous. These products,

as a whole, they are not able to market for as high a price as they receive for fluid milk; the result is that, in the price paid to their producers, each must determine that price, taking into consideration the proportion that goes into each of the classifications and the price receivable from the sale of each.

Time was when the outlet of the farmers' milk in the State of New York was in large proportion in Yankee cheese, but, with the taking over of the milk from the farmers by these large distributors, who paid therefor a larger price than the farmer-owned cheese factories yielded, these farmer-owned Yankee cheese factories have largely disappeared, and the so-called " surplus " is manufactured into cheese or other products by these larger organizations. The result has been that the farmer has largely lost his bargaining power and his independence.

The foregoing facts are intimated, if not expressly declared, in the legislative report, and the knowledge of them by the Legislature seems implicit in the statement of policy which led to the enactment of the Milk Control Act, for it says: " uneconomic trade practices have been and are now carried on in the production, sale and distribution of milk and milk products in this State, whereby the dairy industry in the State and the constant supply of pure milk to the inhabitants of the State are imperiled."

Now it is obvious that an independent dealer like the defendant who is selling milk at wholesale, and who has no means of manufacturing milk products, and who sells his milk to other dealers who either distribute it in the fluid milk market or manufacture it into milk products, and who has no out-State source of supply, is under serious disadvantage, and that the tendency of price-fixing is to work to his disadvantage if not to his ultimate destruction and to the taking over of his milk and stations by larger and more advantageously circumstanced units.

The glory of the American farmer has been his fearless independence, courage and self-reliance; his battle has been with nature; he has to stand the vicissitudes of weather, to study and to know nature's laws, and to accord his actions therewith. He was independent, in that he could provide himself a living, maintain his home and support his family; so long as his bargaining power remained, he asked nothing from the State but to be left alone to fight his own battles. This independence which he formerly enjoyed has made it difficult for him to co-operate; but even yet, fundamentally, he is an individualist. His welcoming of State help through a price-fixing law, which bound him as well as it did the dealer, is but the evidence of the desperate condition which

resulted from the development of forces working against him which, without State help, he could not control. His natural tendency is to support the State, not to be supported by it; he would still be independent, he would not be reduced to serfdom. So we have the spectacle in which today he has no power of contract as to his product; he must deliver it to the milk station or throw it away; he must receive for his product what the State tells him. Now he hesitates to let go of the price-fixing law until the milk industry shall have been so organized that he may receive a fair percentage of the consumer's dollar; and once he knows that, as between him and the distributor, the law of supply and demand is not interrupted by artificialities over which he now has little or no control, he will be willing to take h's chances with the natural and unobstructed workings of the law of supply and demand.

This price-fixing legislation has no analogy in the legislative history of this State; the laws governing public utilities lay no foundation for it. Here is a deliberate effort to interrupt the operation of the law of supply and demand, enacted with full knowledge on the part of any one who has any knowledge of economic history that, with a free market, every such effort has resulted in failure. Such laws may be effective for the moment, and in this instance they have been effective to interrupt for a while economic law, or, rather, to relieve in part the effect of artificialities in distr bution; but in the long run the law of supply and demand will resume its irresistible sway — and this record shows that it is now resuming its sway.

The difficulties in administering such a law are inherent in the nature of the law itself. It was inevitable that there would be resistances set up against it, violations within the State subtle and hard to discover, rebates, "kick-backs," commissions paid brokers, or what not, and at times open evasion by distributors; but in large measure the breakdown in enforcement, which is obvious, is caused by the incoming of out-State-produced and out-State-purchased milk bought at lower prices than those fixed by the Milk Control Board. The wonder is not that the effectiveness of the Milk Control Board's price-fixing orders has been seriously impaired, but rather that its operations have been really effective to aid the dairy farmers of the State at a time of acute emergency.

Milk is a product absolutely necessary to the life and health of people, more necessary than any other commodity except wheat; so there is a constant market for it. The emergency was not caused by any present shortage of supply; at the moment it was economic, affecting the life and welfare of a large proportion of the citizens of the State.

In enacting this extraordinary piece of legislation the Legislature realized the constitutional barriers set up to protect the liberties of the people as a whole and the rights of individuals; by fulsome statement it set up the fact of the economic emergency and the preservation of the public health and welfare as basic reasons for the enactment and invoked the broad police powers of the State.

Section 6 of article I of the Constitution of the State of New York, known as the Bill of Rights, which became a part of the Constitution in 1821, so far as applicable here, reads: " No person shall * * * be deprived of life, liberty or property without due process of law; nor shall any private property be taken for public use without just compensation."

The Fourteenth Amendment to the Constitution of the United States likewise acts as a limitation upon the power of State government; it contains this provision: " No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

In the Fifth Amendment to the Constitution of the United States we find these same words: " No person shall * * * be deprived of life, liberty, or property, without due process of law."

It is evident that the people of the United States, and the people of the State of New York, were so jealous of the individual's right to life, liberty and property that in the fundamental laws they enacted these provisions for his protection.

By and large, the Federal government has no so-called police powers; subject to prohibitions or limitations, all police powers reside and are inherent in the State governments. The police power is the power in government to protect the public health, public safety, morals and general welfare of its citizens. This power in State governments is plenary, excepting as limited by express provisions of the fundamental law. But the limitations upon the exercise of this power are: (1) That the exercise of it shall not deprive a person of life, liberty or property without due process of law, and (2) that a State shall not deny to any person within its jurisdiction the equal protection of the laws.

The determination of the question whether legislation under the police power, or the administration thereof, contravenes guaranteed constitutional rights is a judicial function. The line of demarcation is ofttimes difficult to define, and never more so than in the present day when, due to an economic depression, legislation enacted under the guise of protecting public health, safety and general welfare may so seriously injure or impair individual

rights. In this case the difficulty is not the less because of the distinction between the nature of the State government, in that it is generally one of unlimited powers, and the nature of the Federal government, in that it possesses only such powers as have been delegated to it by the people of the United States. Under the Federal Constitution, if the power does not exist in the government an emergency does not create the power; emergency may awaken the exercise of an existing power. The power granted to the Federal government by the Constitution to use the credit of the government for the general welfare is the power now being invoked as the basis of Federal emergency legislation. A State government is under no such limitations.

In considering legislation by the Congress the question is, have the people, in the United States Constitution, delegated to the government a power; as to State legislation the question is, have the people, in the State Constitution, denied the power, or is that power denied to a State in the United States Constitution?

The Milk Control Law (Agriculture and Markets Law, art. 25) as enacted in 1933 (Chap. 158) was an amendment to article 21 of the Agriculture and Markets Law, under which milk gathering stations had, at least since 1909, been subject to license. This article was rewritten and the price-fixing provisions added to it; the amendment of 1934 (Chap. 126) was simply a division of article 21 into two articles, article 21 and article 21-A; the price-fixing features were set apart in article 21-A, and the administrative agency was changed from the Milk Control Board to the Division of Milk Control, at the head of which should be a director; it worked no change in the substantive provisions as to price-fixing. The powers of the Milk Control Board or Division are: to supervise and regulate the entire milk industry of New York State; to investigate all matters pertaining thereto, with power to subpœna milk dealers and their records; to act as mediator or arbitrator in any controversy which may arise between milk producers and milk dealers; to make rules and orders necessary to carry out the provisions of the article; to make investigations and inspections, and to issue, suspend and revoke licenses of milk dealers.

Section 312 provides for fixing the price of milk as follows:

" (a) The Board shall ascertain * * * what prices for milk in the several localities and markets of the State, and under varying conditions, will best protect the industry in the State * * *. The Board shall take into consideration all conditions affecting the milk industry *including the amount necessary to yield a reasonable return to the producer and to the milk dealer.*

" (b) The Board after making such investigation *shall* fix by official order the minimum wholesale and retail prices and *may* fix by official order the maximum wholesale and retail prices to be charged for milk handled within the State *for fluid consumption,* and wheresoever produced, including the following *classes:*

" 1. By milk dealers to consumers." (A consumer is defined as a person *other than a milk dealer* who purchases milk for fluid consumption. Milk is defined as liquid milk or cream or concentrated whole milk.)

" 2. By milk dealers to stores, either for consumption on the premises or resale to consumers.

" 3. By stores to consumers except for consumption on the premises where sold.

" 4. When * * * various grades of milk are specified, the Board *shall* fix the minimum price and *may* fix the maximum price applicable to each in each of the *foregoing classes.* * * *

" (c) It is the intent of the Legislature that the public emergency requires that the benefits of any increase of prices received by milk dealers by virtue of the minimum price provisions of this section shall be given to producers.. To that end, if the Board after investigation * * * shall determine that such milk dealer purchasing milk from producers * * * in making such purchases has failed to give fair and reasonable effect to such intent, the Board shall, upon due notice and after a hearing suspend or revoke the license of the milk dealer so offending and in addition thereto, a violation of this subdivision shall render such offending milk dealer subject to the provisions of section three hundred seven of this article." (Section 307 applies to remedies for the violation of the article or of any lawful rule of the Milk Control Board.)

(*Note.* Nothing is said about dealer to dealer transactions.)

It is obvious that none of the foregoing provisions, excepting (c), has any application to the circumstances of this case.

" (d) The Board after making such investigation * * * may fix by official order the minimum prices to be paid by milk dealers to producers *and others* for milk *of the various forms included within the definition of milk* as used in this article and its various grades and uses * * *. Each such order may classify such milk by forms, classes, grades or uses as the Board may deem advisable and may specify the minimum prices therefor.

" (e) After the Board shall have fixed prices to be charged or paid for milk in any form *included in the definition of milk used as in this article* whether by class, grade or use, it shall be unlawful for a milk dealer to sell or buy or offer to sell or buy milk at any

price less or more than such price or prices as shall be applicable to the particular transaction, * * *.

" (f) The Board may upon its own motion or upon application from time to time alter, revise or amend an official order theretofore made with respect to the prices to be charged or paid for milk. After making such investigation and *before making, revising or amending any order fixing the price to be charged or paid for milk, the Board shall give a hearing thereon to all parties interested upon reasonable notice to such interested parties and to the public of such hearing in such newspaper or newspapers as in the judgment of the Board shall afford sufficient notice and publicity.* Such order of the Board may be reviewed by certiorari order at the instance of any aggrieved person *appearing of record at the hearing* * * * opposing the making of the order.

" (g) It is the intent of the Legislature that the instant, whenever that may be, that the handling within the State by a milk dealer of milk produced outside of the State becomes a subject of regulation by the State, in the exercise of its police powers, the restrictions set forth in this article respecting such milk so produced shall apply and the powers conferred by this article on the Board shall attach. After any such milk so produced shall have come to rest within the State, any sale, within the State by a licensed milk dealer or a milk dealer required by this article to be licensed, of any such milk purchased from the producer at a price lower than that required to be paid for milk produced within the State purchased under similar conditions, shall be un awful."

The power to fix minimum prices to be received for milk sold to consumers has been sustained as a valid exercise of legislative power by our Court of Appeals. It treats of the price-fixing provisions of the law as emergency legislation. (*People* v. *Nebbia*, 262 N. Y. 259; affd., 291 U. S. 502.)

In the *Nebbia* case the Milk Control Board had fixed a minimum price to consumers of nine cents per quart; the defendant Nebbia had sold milk at less than this price and, for so doing, was convicted of having committed a misdemeanor; the appeal was from this conviction. The court said: " The question is whether the act, so far as it provides for fixing minimum prices for milk, is unconstitutional under New York Constitution, article 1, section 6, and United States Constitution, Fourteenth Amendment, in that it interferes with the right of the milk dealer to carry on his business in such manner as suits his convenience, without State interference as to the price at which he shall sell his milk." The court held that an order of the Milk Control Board fixing minimum prices at which milk might be sold to consumers was not in con-

travention of constitutional inhibitions. This case is an authority on that question alone. The order could not be held to be confiscatory, because it set no limit to the charging of a higher price to the consumer. The question of whether the fixing of a maximum price to be charged to a consumer would be within the power of the Milk Control Board was not involved. Furthermore, no question was raised as to the regularity of the action of the Board in adopting the price-fixing order; nor was there any charge that it had not complied with the requirements of the statute as conditions precedent to the exercise of the power to fix minimum prices to the consumer. The Court of Appeals uses this language: " Price is regulated to protect the farmer from the exactions of purchasers against which he cannot protect himself."

· I am of the opinion that the Legislature, under the police power, subject of course to the limitations of section 6 of article I of the State Constitution and to the provisions of the Fourteenth Amendment to the Federal Constitution, *supra*, had the power to enact this price-fixing legislation. The question as to whether the law or a price-fixing order under it would operate (a) to deny a person the equal protection of the laws, or the right to property or liberty without due process of law, or (b) to work a confiscation of property or a discrimination, would remain and depend on the circumstances in each particular situation.

The Legislature of a State has plenary power, subject only to express constitutional inhibitions, to enact legislation to meet an emergency affecting the safety, health or welfare of the people of the State.

The Legislature realized the difficulty of the enforcement of price-fixing regulations unless the distribution of out-of-State milk could be in a measure controlled, and, therefore, sought to provide against this contingency at subdivision g of section 312, above quoted. This provision has been held by the Supreme Court of the United States to be unconstitutional in that it violates clause 3, section 8 of article I of the Federal Constitution, which grants to Congress the power to regulate " commerce with foreign Nations and among the several States," and also section 1 of the Fourteenth Amendment thereto, which provides that no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, and upon the specific ground that " such a power, if exerted, will set a barrier to traffic between one State and another as effective as if customs duties, equal to the price differential, had been laid upon the thing transported." (*Baldwin* v. *Seelig*, 294 U. S. 511; 55 Sup. Ct. 497.)

The court calls attention to section 10, clause 2, of article I, by which the States are prohibited to " without Consent of the Congress, lay any Imposts or Duties on Imports or Exports *except what may be absolutely necessary for executing its inspection Laws.*"

Prior to the decision the feeling was prevalent that subdivision g of section 312 was violative of the interstate commerce clause of the Constitution of the United States; this fact, and the decision of the United States Supreme Court confirming the view, have seriously hampered the Milk Control Board in enforcing its price-fixing orders. The effect of this decision is obvious; it made legal the importation of out-State milk into the State of New York, without any limitation or restriction by reason of the price regulations.

The *Seelig* case should be limited in its application strictly to what was decided. The Supreme Court of the United States was careful to avoid any limitation upon the power of a State to protect the health of its citizens, or to hold that any legislation really designed for such purpose would be repugnant to any constitutional provision. Its reference to clause 2 of section 10 of article I of the Constitution is significant, in that it quotes from this section, which limits the power of States in reference to interstate commerce, the language " except what may be absolutely necessary for executing its inspection laws."

The health regulations of the State of New York, and especially those of the city of New York, affecting the production of milk for fluid consumption are perhaps as severe as any in the country and place a heavy burden upon the farmers of this State; and the inspection for the protection of the milk supply of the Metropolitan area, in the enforcement of health regulations, is strict and at times seems harassing to a farmer who knows how pure milk should be produced and how to avoid contamination of it. Out-State producers should be subjected to the same regulations and inspection at the farm before any of their milk should be allowed entry into this State.

It may be accepted as the law that the prohibitions contained in section 10 of article I of the Federal Constitution do not limit the power of a State to protect the public health, public morals or the safety of its citizens. Legislation designed to effect these purposes, even though its operation may incidentally, as distinguished from purposely, interfere with interstate commerce, is within the legislative power of a State. The Legislature has the power to provide that no milk shall come within the State of New York for human consumption therein which has not been produced and handled under the same conditions and regulations and subject

to the same inspections as apply to those producing milk within the State; it has been held that it has the power, for a like purpose, to control the importation of cows designed for the production of milk, as to their condition of health and their carrying power of infection. The Legislature has the power to limit the length of the tether of its milk inspection; it would be ridiculous to say that in order to protect the health of its people it would have to inspect all the dairies in the United States; it would be enough to inspect sufficient thereof so that an adequate supply of pure and wholesome milk might at all times and in all seasons be available to its people.

The United States Supreme Court held, in the *Seelig* case, that the price-fixing regulations, properly interpreted, were not inspired by considerations of public health, but that the declaration of such purpose was but a guise to disguise the real purpose of the law, which it stated was an economic one.

Unless State health regulations as to fluid milk for human consumption are made equally applicable to out-State milk, the dairy farmers of the State might well complain that they were being denied " the equal protection of the laws."

Legislation effective (a) to secure strict inspection of out-State milk and (b), to use the language of the Court of Appeals in the *Nebbia* case, " to protect the farmer from the exactions of purchasers against which he cannot protect himself " would not only be within the legislative power of the State, but would go far to eliminate the necessity of the present complex system of price-fixing. With such legislation, the farmer would be, as he should be, affected by the normal operation of the law of supply and demand.

Now for the specific defenses:

*First.* The defendant attacks the validity of the official orders of the Milk Control Board fixing prices to be paid by dealers to producers.

(a) On the ground that the Milk Control Board acquired no jurisdiction, in that it did not comply with the provisions of subdivision f of section 312 of the statute, which requires " reasonable notice to such interested parties and to the public of such hearing in such newspaper or newspapers as in the judgment of the Board shall afford sufficient notice and publicity."

On May 10, 1933, the Milk Control Board held a hearing, upon notice dated Albany, N. Y., May 5, 1933, and a supplemental notice of such hearing on such date, stating the hour and place; and, so far as is pertinent here, the object of such hearing was as follows: " for the purpose of supplementing, altering, revising

and/or amending any and all official orders heretofore promulgated by the Board, and/or for the purpose of exercising its powers under Section 312, subdivision (d) of the Milk Control Law by fixing by official order the minimum prices to be paid by milk dealers to producers and others for milk as defined in the law (including cream and condensed or concentrated milk, except in hermetically sealed cans), which prices may vary according to varying uses and/or conditions, according to forms, classes and/or grades, and/or according to the locality or zone in which the milk is produced and/or the market or markets in which it is sold."

Publicity was given by posting the notices on the bulletin board in the Albany, N. Y., office of the Milk Control Board and by handing copies of them to the representatives of the Associated Press and the United Press with the request that publicity be given to them; these are great news-gathering associations whose wire services are leased by the daily newspapers of the State and country; the notice of the meeting was transmitted to the newspapers over the news wires, and, having great news value, the fact and the time of the hearing were quite generally published throughout the State. The many milk dealers and close to 100,000 farmers were interested in and to be affected by any official orders issued as a result of the meeting. The meeting was well attended; representatives of the various producers' associations and of many dealers attending the hearing; it is safe to say that upwards of seventy per cent of the dairy farmers and the milk dealers of the State were represented at the hearing.

The statute is unique in that it delegates to the Milk Control Board the power to determine (1) what is reasonable notice of hearing as to time, and (2) what publicity should be given to it.

As fundamental property rights of dealers and of dairy farmers would be affected by any official orders issued by the Milk Control Board, we are here dealing with a question of jurisdiction and of notice which are of the very essence of " due process." While, as a general rule, there is a presumption that public officials performing administrative functions have done their duty, there is no such presumption where a question of jurisdiction is involved. In this instance judidsdiction depends on due notice. When one considers the punctilious care which is taken by the Legislature in the Civil Practice Act in reference to notice as a condition precedent to jurisdiction of the courts where property rights are to be affected, it is suprising that it delegated to an administrative agency power to determine what are reasonable notice and publicity. If this be delegation of legislative power, as distinguished from an administrative power, then of course the provision

of the statute is void, on the ground that the Legislature may not, under the Constitution, delegate a legislative power. I am not here asked to decide, nor do I pass upon, the question as to whether this provision of the statute constituted an unlawful delegation of legislative power.

There is no evidence that the Milk Control Board had at any meeting adopted any resolution determining what was, under all the circumstances, reasonable notice and publicity; all it seems to have done was to post the notice of hearing and hand it to the newspapers, in the expectation that they would give publicity to it. The nature of the proceeding for the adoption of price-fixing orders was such that it would be unreasonable to expect that personal notice could be given to all of those to be affected; but it would have been easy for the Milk Control Board to have considered the question, established the number of days' notice and provided (as an illustration) that such notice should be given to the presidents of the Dairymen's League Co-operative Association (which has from 50,000 to 55,000 members); the Sheffield Producers Co-operative Association (which has some 15,000 members), and the other known co-operative associations, and to the large dealers — Sheffield Farms, Inc., the Borden Company, the Dairymen's League and other known dealers' organizations — by mail or telegram, and then to have given publication of the notice in such newspapers, strategically situated throughout the State, as they might by resolution determine. But nothing of this kind was done, so far as this record shows; and the Milk Control Board, as to all subsequent official orders affecting prices, proceeded in the same manner, both as to notice and as to publicity. While, as a legal proposition, I cannot bring myself to the view that the method pursued by the Milk Control Board even met the requirements of the statute, nevertheless the defendant here is in no position to raise this question, for the reason that he personally attended and participated in the hearing; neither he nor any one else raised any question as to the reasonableness of the notice or of the publicity, or as to the jurisdiction of the Milk Control Board, and certainly this defendant, having attended the hearing and having raised no objection to the jurisdiction, must be held to have waived any right to raise that question now.

The foregoing in no wise affects the question of the legality of the official orders themselves if they were beyond the power of the Milk Control Board to adopt, or as to the method of their adoption, or as to whether they were reasonable, arbitrary, capricious, confiscatory or not adapted to the accomplishment of the purposes of the price-fixing provisions of the Milk Control Law.

(b) The defendant attacks the validity of the price-fixing orders of the Milk Control Board upon the ground that the Board failed to comply with the provisions of the statute as set forth in subdivision f of section 312, *supra*. This is an ambiguous provision, difficult to understand and difficult to apply. The practice of the Milk Control Board has been, after giving such notice as has been above shown, to have an open discussion of the question of price, and, after the discussion, to prepare the official order fixing prices or amendments to any previous order. This matter is of vital importance, for the reason that it conditions the very right to issue a price-fixing order. It is no reflection upon the action of the Milk Control Board or its counsel that it found great difficulty in interpreting and complying with this confusing piece of legislation. It could not be literally complied with; to do so would necessitate the preparation in advance of the hearing of a proposed official order fixing minimum prices to be paid by dealers to producers for milk of the various forms included within the definition of milk and according to its classifications as to use as shown in the proposed order; if the Board would modify this proposed official order, it must call for a hearing as to the proposed change, for the reason that the statute says that before *making* any such order it shall give a hearing *thereon;* and so on, *ad infinitum*. Literally to have complied with this provision would not have met the emergency, but would have indefinitely postponed action.

Then the provision is that the Board may, upon its own motion, revise or amend an official order fixing prices; but, before revising or amending, as well as before making, there must be a " hearing thereon." The difficulty arises in the interpretation to be put upon the words " hearing thereon," which, literally construed, involved the existence of an order *made*, upon which a hearing could be had. A fair interpretation of these words is that there should be a hearing on the subject-matter involved in an order fixing prices about to be made.

My judgment is that the Board did about the only practical thing that it could do; it gave hearing upon the subject of price-fixing and the various phases of it, at which hearing those interested were given opportunity to present their views; the hearing was attended by representatives of substantially all of those engaged in producing or distributing milk in the " Metropolitan area." Having listened to the views of all parties who desired to present them at this hearing of May 10, 1933, official order No. 17, of May 12, 1933, effective May 16, 1933, was made. The Milk Control Board has fairly interpreted and given expression to the real meaning of this very ambiguous provision. It did give a

hearing before adopting the order; this was a strict compliance with the letter of the statute. This provision under consideration should be so interpreted as to carry out the legislative intent. This interpretation of this provision was the intent of the Legislature; but if there is to be any permanency to the price-fixing provisions of the Milk Control Law this provision and the provision as to notice should be clarified, because these two matters of notice and hearing lay at the very foundation of the right to fix prices.

The same course was taken in adopting amendments to the price-fixing order, the difference being that, as to all except the first hearing, the Board did have before it an official order, and the hearings were upon amendments to existing official orders. So, as to subsequent amendments, any infirmity in procedure would seem to have been cured.

*Second.* The defendant attacks the price-fixing order known as official order No. 17, and the subsequent official orders amendatory thereof, on grounds which, if sustained, would make them invalid as a whole; he also attacks on the ground that the Board in adopting certain provisions in the orders exceeded the powers granted to it by the statute.

Official order No. 17 defines the various classifications of milk by the use to which it is put; it fixes the price to be paid by a dealer to a producer for each class; it contains certain administrative provisions. Paragraph 1 of the order divides milk into seven classes, known as class 1, class 2-A, class 2-B, class 2-C, class 3, class 4-A and class 4-B.

Those which are pertinent here are as follows:

" Class 1 milk is defined as including any milk purchased or received or handled by a milk dealer *and so marketed as to be readily open to the supposition that it will find its ordinary utilization by human consumption as raw or pasteurized milk.* It includes all milk leaving a milk plant or receiving station in fluid form, in the absence of clear proof that such milk is so utilized as to fall into some other class."

(Base price for class 1 milk was fixed at one dollar and eighty-eight cents per 100 pounds, three and five-tenths per cent butter fat, with differentials.)

" Class 2-A milk is defined as including any milk purchased or received or handled by a milk dealer *and so marketed as to be readily open to the supposition that it will find its ordinary utilization as fluid cream.*"

(Price for this class 2-A milk was fixed at one dollar and thirty cents per 100 pounds.)

" Class 2-B milk is defined as including any milk purchased or received or handled by a milk dealer *and so marketed as to be readily open to the supposition that it will find its ordinary utilization as plain condensed milk, as milk used in ice cream and homogenized mixtures and in certain forms of cheese.* It includes all milk made into plain condensed milk, all milk used in the manufacture of homogenized mixtures composed entirely of milk products with the addition only of sugar, flavors, gelatine and other binders, all milk used in the manufacture of ice cream, all milk used in the manufacture of cheeses of soft type, such as * * *."

(Price of class 2-B milk was fixed at one dollar and fifty cents per 100 pounds.)

" Class 2-C includes milk from which is derived, stored, frozen cream, the ultimate disposition of which is ice cream or homogenized mixtures or cream cheese or other manufactured dairy products."

(Price for class 2-C milk was fixed at one dollar and twenty cents per 100 pounds.)

Paragraph 17 of said official order provides as follows: " No milk dealer shall buy or offer to buy milk at any price less than the price hereby established applicable to such transaction, and no method or device shall be employed whereby milk is bought or offered to be bought at any lesser price, whether by any discount, or rebate, or excessive charge of hauling or other service, or any other method or device whatsoever. *Any method or device which is employed in an effort to defeat the intent of this order, as well as any direct violation of it, will be deemed sufficient cause to suspend or revoke the license of the offending milk dealer without further or specific warning."*

By official order No. 19, dated Albany, N. Y., May 18, 1933, official order No. 17 was amended in several particulars, and, so far as essential to the issues involved herein, is as follows. The definition of class 2-C was changed to read as follows: " Class 2-C includes all milk used in the manufacture of ice cream *in New York City and* milk from which is derived [stored frozen cream, the ultimate disposition of which is ice cream, or homogenized mixtures or cream cheese or other manufactured dairy products] *fresh or storage cream and unsweetened condensed milk, used in the manufacture of ice cream in New York City. It also includes milk from which is derived storage cream used in the manufacture of sour cream."*

There were added, by this order, two new classifications, as follows: class 2-D and class 2-E.

" Class 2-D includes all milk used in the manufacture of ice cream *outside of New York City* and milk from which is derived

cream and unsweetened condensed milk used in the manufacture of ice cream outside of New York City."

" Class 2-E includes all milk from which is derived storage cream used in the manufacture of cream cheese."

The order also established the base price for class 2-C milk at one dollar and twenty cents per 100 pounds; for class 2-D milk at not less than fifteen cents more than the price determined for class 4-A milk, and the base price for class 2-E milk to be not less than ten cents more than the price determined for class 4-A milk.

Official order No. 32, effective July 1, 1933, was a revision of the previous price-fixing orders, putting them into one order. It continues the same classifications as provided for in official order No. 17 and official order No. 19, and changes certain base prices.

The defendant attacks the price-fixing orders on several general grounds:

(a) One ground is that the official orders, not being applicable to out-State milk sold in competition with the defendant as a milk dealer, are discriminatory and, therefore, illegal and void; that they are discriminatory in that such milk was purchased by dealers from out-of-the-State sources at prices lower than those fixed in the official orders; that this resulted in a breakdown in the market price in the Metropolitan area, with the effect that the resale price therein was less than defendant was required to pay his producers under the price-fixing orders, and that the effect of the operation of these price-fixing orders had been to deprive the New York State dairymen of a considerable part of the preferential fluid milk market and to force independent milk dealers with plant investments wholly in the State of New York to operate at a loss, and to force a violation of the official orders in order to break even, or to make purchases from outside the State, or from large co-operatives or dealers who bought from without the State and who were not, therefore, affected by the official orders.

The evidence in the case shows beyond question that, considering only the question of quantity of fluid milk used in the Metropolitan area, the farmers of New York State have lost and are losing a considerable portion of their market for fluid milk in the Metropolitan area. The peak consumption in such area was reached in the year 1930, when it reached 36,469,796 forty-quart cans. Of this amount, the New York State dairy farmers supplied 27,530,829 cans; Pennsylvania, 5,079,238 cans; New Jersey, 2,163,064 cans; other States, 1,696,655 cans. New York State dairy farmers had supplied substantially the same number of cans for the three previous years, 1927, 1928 and 1929.

In 1931 the total consumption in the Metropolitan area was 35,534,977 cans, a reduction of 934,819 cans from the 1930 consumption, while the reduction in the amount furnished by New York State farmers was 1,717,935 cans; from which it appears that the New York State farmers lost their market for the full amount of the shrinkage in consumption and for 783,126 cans in addition thereto.

In 1932 the total consumption in such area was 34,431,311 cans, a reduction of 1,103,666 cans from the 1931 consumption, while there was a reduction in the amount furnished by New York State farmers of 1,905,712 cans; from which it appears that New York State farmers lost their market for the full amount of the shrinkage in consumption and for 802,046 cans in addition thereto.

While this reduction in New York State supply took place, there was a corresponding increase in the quantity of milk purchased from Pennsylvania, New Jersey and other States. This loss to the New York State dairy farmers was taking place prior to the Milk Control Law, which did not go into effect until April 1, 1933, but was effected by other causes, possibly through the strictures of New York health regulations, possibly by natural causes, or policies of large dealers, or possibly by all three.

In 1933 there was a further decline in consumption in such area of 1,389,538 cans. The decline in the milk furnished by New York State farmers was 1,523,659 cans, or from 23,907,182 cans to 22,383,523 cans; the milk received from Pennsylvania declined 45,415 cans; the milk received from New Jersey increased by 402,490 cans, while the milk from Vermont and other States declined 222,914 cans. (Query: Was any of this New York State milk by-passed through New Jersey and thence to the Metropolitan area in order to take advantage of New Jersey lower prices?)

In 1934 there was a further decline in consumption in such area of 1,478,851 cans. The decline in the milk furnished by New York State farmers was 1,517,870 cans, from 22,383,523 to 20,865,653 cans. Pennsylvania increased its contribution in this period by 102,915 cans, while New Jersey increased its contribution by 100,515 cans, and Vermont and other States fell off in the r contribution 264,401 cans.

A study of this evidence shows that from 1930, the high point of consumption, down through the depression years to and including 1934, the New York State farmers have taken up over the full amount of the decline in consumption, while the contributions of the other States have held substantially steady, or, as in New Jersey, have materially increased in their contribution to the Metropolitan area.

This reveals the operation of forces working against the New York State dairy farmers and especially in favor of the farmers in the States of Pennsylvania and New Jersey (the quantity of milk coming from Vermont and the other States has declined from a total of 1,862,471 cans in 1931 to 1,673,051 cans in 1934).

The study of the foregoing figures, however, does not lead to the conclusion that the decline since April 1, 1933, in the contribution of the New York State farmers was due solely to the operation of the Milk Control Law; but the ev'dence is not lacking that a considerable part of such decline has been due to the price-fixing features thereof. In the presence of the tremendous agitation on the subject of price-fixing in New York State prior to the enactment of the law, large milk dealers may have taken and they naturally would take precautions to protect themselves by making provision for purchasing milk from outside New York State. It was inevitable that this drastic law would effect dislocations and efforts to avoid the consequences of it by those who were in position to protect themselves against such consequences. The burden of any loss in this respect has been borne in part by the smaller dealers, but to a larger extent by the New York State dairy farmers themselves, for whose benefit and largely at whose behest the law was enacted. The law would have effectuated its purpose to improve the condition of the New York State dairy farmers if effective measures could have been taken to dam the flow of out-State milk to the Metropolitan area, but not for long if there were outside sources of milk supply available to distributing dealers at lower prices. We have here but another illustration of the futility of price-fixing to defeat for any great length of time the natural workings of the law of supply and demand.

The Milk Control Law is general in its application; it applies to all State dealers and distributors. The defendant has failed to show any but general consequences; so far as he himself is concerned, he has offered no evidence on the subject; he was not even sworn as a witness; he did not produce his books showing his transactions; he has only shown a general tendency, but not that he has been affected by it. How, then, can it be held that the law passed by the Legislature of the State of New York, which applies to all similarly situated, is discriminatory or works a denial of the equal protection of the laws to this defendant?

While it seems clear that this law is working against small dealers circumstanced as is the defendant, whose receiving stations are within this State, and tends to their disadvantage and to concentration of milk distribution into larger units, I am of the opinion that the defendant's criticism of the law, to the effect that because

it does not apply to interstate milk sold in competition with the defendant, raises no judicial question. If its operation has had the effect to increase the amount of fluid milk from sources outside of this State, and, therefore, to limit the market of the defendant, the effect is general as to all producers and to all dealers not having outside sources of milk supply; and it raises a question not of discrimination but a question as to the wisdom of the law itself, which s not a matter for the consideration of the court.

(b) That there has been unequal enforcement of the law and the provisions of the official orders. Evidence has been produced from which it might be inferred that the official orders have not been enforced against all violators; it is also evident that the Milk Control Board has been diligent in its efforts to enforce the law; the trouble is inherent in the nature of the law itself, not only by reason of the magnitude of the problem, but also because of the inflow of under-price out-State milk. The difficulties are obvious, but I do not think that the defendant is in any position to urge this as a matter of defense against an effort to enforce a lawful official order against him if he has violated it. The fact that A is not punished for an unlawful act does not justify B in committing such an act. Non-enforcibility may be a ground for repeal of the law, or for criticism of those engaged in the enforcement of it, but it can scarcely be urged as justification for the violation of it.

As has been heretofore noted, questions of public policy, whether based upon economic or other considerations, are matters for the Legis ature and not for the courts. If the Legislature enacts laws wh ch burden industry in the State as a whole so that the tendency is to drive industry out of the State, or if the Legislature burdens the production and distribution of milk for human consumption, as by health or other regulations, and does not impose a like burden upon such milk imported into the State, if the effect of price-fixing regulations by the Milk Control Board, lawfully adopted, is to drive dealers to the purchase of milk from outside the State because it can there be purchased at a lower price, questions of public policy, not judicial questions, arise. If the Legislature exempts from the operation of a law designed to regulate production and distribution of a commodity necessary to the public health and safety a particular class of distributors or producers, or if the operation of the law is such in reference to a particular set of producers or distributors engaged in the same business as to raise a question of whether the law is discriminatory in fact or whether it denies to any persons in the same class the equal protection of the laws, that raises a judicial question.

So far as I have been able to discover, the official orders fixing prices are devoid of any provision governing prices where the transaction is a dealer to dealer transaction. (Producers' co-operatives, by section 313 of the 1933 law, may blend out-of-State and intra-State purchases. In so far as a co-operative is treated as a producer, this creates no discrimination; in so far as it is a dealer, the dis-criminatory effect is obvious.) How it is possible for a dealer circumstanced as is this defendant to live at all under the price-fixing regulations, where there is no tolerance in dealer to dealer transactions, it is difficult to understand; he does not distribute fluid milk to the consumer; the wholesale purchaser of his fluid milk will not pay more than the price which he pays his producers so long as the milk is available to him at prices lower than those fixed to be paid to producers for fluid milk; his only opportunity for gain, under such circumstances, would be to himself engage in distribution to the consumer; but this would drive him also to the purchase of out-State milk if obtainable at lower prices. The only manufacturing he does is the separation of cream — which is scarcely manufacturing; he resells to dealers who distribute milk or manufacture it into divers milk products; he cannot make his profit, therefore, out of resale to a dealer distributing fluid milk, or the sale of manufactured milk products; if he sells to the fluid milk market, his purchasing distributor must pay him the price fixed by the official orders; if he sells to a dealer who manufactures, that dealer must pay him the price fixed by the official orders; his manufacturing purchaser may make a profit, and his purchaser distributing to consumers in the fluid milk market may make a profit. It is evident that where a dealer is largely engaged in the distribution of fluid milk he may make a profit. But the record here is devoid of any evidence on this subject.

The fact that the Superior Court of Pennsylvania, in the case of *Rohrer* v. *Pennsylvania Milk Control Board* (—— Penn. St. ——; 184 A. 133), has recently (March 16, 1936) held the price-fixing features of the Milk Control Board Law to be in violation of the Constitution of that State only serves to make the problem more difficult for New York State dealers, producers and our Division of Milk Control.

The powers granted by the Legislature to the Milk Control Board were not designed or on their face calculated either to be discriminatory or to deny to any class of dealers or milk producers the equal protection of the laws. The burden was upon the defendant, if he would invoke the judicial power, to show with definiteness that he was a dealer of a class as against which the price-fixing regulations worked a discrimination, and that the effect of them was to deny the equal protection of the laws, so that a definite finding could be

made as to the facts so as to formulate a basis for the determination of the law. The defendant has not even shown any economic loss by reason of any discrimination; nor has he shown with sufficient definiteness the type or class of dealer which suffered an economic loss by reason of the operation of these price-fixing regulations which was due to the discriminatory character of the regulations and that the discrimination was such as to deny to him the equal protection of the laws. The court would have jurisdiction to pass upon this question. If evidence had been offered here showing that the price-fixing orders and their administration operated to impair defendant's right to life, liberty or property, or the equal protection of the laws, there would have been no hesitancy on the part of the court to so declare and to apply the proper remedy.

*Third.* The defendant challenges as illegal and void the suppositional or presumptive provisions of the official orders fixing prices (see definitions of class 1 milk, class 2-A milk and class 2-B milk, *supra*), which base the classes of milk not upon actual definition but upon the method of marketing. The definition of each of said three classes contains the italicized language taken from the definition of class 1 milk: " including any milk purchased or received or handled by a milk dealer *and so marketed as to be readily open to the supposition that it will find its ordinary utilization by human consumption as raw or pasteurized milk.* It includes all milk leaving a milk plant or receiving station in fluid form, in the absence of clear proof that such milk is so utilized as to fall into some other class." (Official order No. 17.)

Subdivision 2 of the official orders reads as follows: " It shall be presumed, *in the absence of clear proof to the contrary,* that any milk purchased or received or handled by a milk dealer, except at a plant or receiving station engaged continuously and solely in manufacturing the milk, leaves such plant or receiving station in fluid form."

The Milk Control Board had power, under the act, to " classify milk by forms, classes, grades or uses and to specify minimum prices therefor " in order to determine the price which a dealer should pay a producer. Different prices were fixed by official orders for the different classes, which were generally defined by the uses to which the milk was put. A classification of milk according to different uses and fixing prices according thereto was, *to a certain and reasonable extent at least,* necessary to the end that there might be a fairly equalized price to the producers. It is obvious that it costs the producer the same to produce milk (if any of it is for the fluid milk market), whether it is used as fluid milk or in the manufacture of milk products, such as butter or cheese of various kinds, evaporated milk, condensed milk; and yet the price ordinarily

obtainable for manufactured products of milk would not warrant a price to the producer, for milk so used, as high as a price which would be warranted for milk distributed as fluid milk; so that when the dealer comes to determine the price which he should pay to his producer, that price is arrived at according to the proportion of the milk used in such class. The effect necessarily is that prices paid to producers vary somewhat, according as their dealers use a greater or less proportion of their milk for the higher-priced uses. Irrespective of the wisdom of this method of determining price, it is clearly within the intent of the law that the Milk Control Board or Division of Milk Control classify milk according to its uses and fix prices appropriate for each class. These classifications are clearly defined. When the dealer fixes his price to his producer, he is required to classify his milk according to the uses to which the milk is put and report the classes to the Division of Milk Control.

Now a classification based upon *presumption or supposition* as to the use is no classification at all. The use to which the milk is put allocates its classification: that use had to appear upon the books of the dealer or reports of the dealer, or both. It is not a matter of presumption or of supposition; it is a matter of fact. Where a dealer is in position at his plant to manufacture milk products, as cheese, or butter, or evaporated milk, it is a simple matter for him to determine the quantity of milk used in each class; but where a dealer, as was the case of this defendant, sells milk or cream to another dealer for distribution as fluid milk, or for manufacturing, he should receive payment for that milk according to the uses to which it was put by such purchaser. This also is a question of fact, which could be readily determined by an examination of the books of such a purchaser and of such a dealer. It is not a question of supposition or presumption. To base classifications of milk, as class 1 milk, for instance, on a *presumption or supposition*, and to make that *presumption or supposition* binding upon a dealer purchasing milk for resale to a distributing or manufacturing dealer, in his relationship to his producer, in the absence of clear proof that such milk was not utilized in some other class than class 1, is not classification as was intended by the law; nor is it an administrative regulation; it is an attempt upon the part of the Milk Control Board to change the accepted rules of evidence by establishing a fact by mere presumption or supposition, and casting upon the immediate purchaser of the producer's milk the burden of showing that he had not violated the regulation in making his classification. No power was granted by the Legislature to the Milk Control Board to change the laws of evidence. This act of the Milk Control Board was legislative, not administrative; it

was an attempt to exercise a power which the Legislature did not grant and which it had no power to grant to an administrative agency. If this were a valid provision, then who determines that the milk is open to a supposition or presumption as to its use: the auditor, the Board, the dealer, or the producer? Clearly there is difficulty in making classifications where a dealer operating a milk station sells his milk purchased directly from producers to another dealer who either manufactures milk into milk products or distributes to the consumer. The price which a dealer receives from another dealer would be more determinative of the fact than any presumption or supposition as to the use to which the milk was ultimately put. No matter how difficult the problem may be, the Division of Milk Control should adopt a formula fair to all which will meet dealer to dealer transactions.

*Fourth.* The defendant challenges the validity of the order revoking his license unless he makes certain payments to producers delivering milk to his milk stations.

The plaintiff bases his claim for damages on the assumption that the amount which he received for his milk from the defendant was not predicated upon a proper classification as to the use of the milk which he delivered to the defendant's milk station. The amount sought to be recovered is based, for the period from May 16, 1933, to and including the month of September, 1934, upon the findings and the order of the Commissioner of Agriculture revoking the defendant's license, and, for milk delivered during the period from September 30, 1934, to and including the month of February, 1935, upon the auditors' reports reclassifying defendant's milk.

The dairy farmer producing milk for the Metropolitan area has had no bargaining power since the Milk Control Law went into effect. Strange indeed it is that, so far as I have been able to discover, the deprivation of this bargaining power has not been attacked by a dairy farmer as an unconstitutional invasion of a fundamental right. Some day, and immediately that he learns that the price-fixing is working to his disadvantage, his voice will be heard.

The auditors of the Milk Control Board or Division of Milk Control had access to the books and records of the defendant's transactions; they had the record of his disposal of the milk he had purchased, his classifications, the part that was classified as 2-E mi k or milk from which is derived storage cream used in the manufacture of cream cheese. Practically all differences arise over the milk (cream) placed by the defendant in cold storage, which he classified as 2-E, and for which he paid his producers the class 2-E price. This stored cream was not actually sold by him to

another dealer until months after. Assuming this milk was properly classified as 2-E, the defendant paid his producers their proper price, and did this before he had disposed of the cream. The auditors of the Milk Control Board or Division, on their own motion and without advising the defendant, classified this milk into higher priced classifications, as class 2-A or class 2-C, and it is the use of these higher priced classifications by the auditors which is the sole basis of the claim that the defendant has underpaid the plaintiff and other producers. It is also this reclassification by said auditors which formulates the real basis for the order revoking defendant's license as a dealer. The record of the hearing in the revocation proceeding is a part of the record in this case. These changes in classifications were based not upon evidence, but upon *suppositions or presumptions* heretofore enumerated. Using these suppositions or presumptions as a basis of changing the classifications of this storage cream from 2-E to higher classifications, the amount of underpayment from May 16, 1933, to and including the month of September, 1934, to defendant's producers, was $55,333.32; and the same is true as to the underpayments set forth in the schedule attached to the complaint for the remaining months from October, 1934, to and including February, 1935. The addition of the shortages claimed in these latter months, applying to all the patrons of defendant's milk station, would increase the amount due to such patrons by about $8,500, which, added to the amount found as underpaid in the revoking order, would bring the total claimed to be due to the defendant's patrons to about $64,000.

This defendant and his predecessors have operated these milk stations many years prior to the creation of the Milk Control Board. Apparently the defendant's dealings with his producers were honorable up until the time of the enactment of the Milk Control Law. He is an intelligent man, if one may judge from his conduct before the Director of Milk Control on the revocation hearing. The revocation of his license, or the enforcement of the condition upon which it may be renewed, either one, might spell the ruin of an industry which has been operating for upwards of twenty to twenty-five years. The proceedings for the revocation of defendant's license were occasioned by the conduct of bookkeepers known as auditors in arbitrarily changing the classifications of the milk received by the defendant from those used by him; not a scintilla of evidence justified such reclassification; only the invalid provisions of the official orders classifying milk upon supposition or presumption furnished the basis of the reclassification; apart from these assumptions or presumptions there was no occasion for the revocation proceeding.

The plaintiff here does not seek to recover, as on a contract, the fair and reasonable value of the milk which he delivered to the defendant, nor is there any evidence to show what that value was. After the Milk Control Law went into effect there was no express contract between the parties as to price; milk control prices governed each, as to milk delivered and accepted. The defendant paid milk control prices according to his classification, but not according to the classification of the auditors of the Milk Board.

The cream made from the milk classified by the defendant as 2-E milk was put into storage warehouses and remained unsold for months. The farmer was paid bi-monthly. The defendant's records revealed to the auditors the prices that he received upon the sale of this storage cream, to whom it was sold, and when. Some of this storage cream was sold for nine dollars and fifty cents, some for eleven dollars and fifty cents and some for thirteen dollars and fifty cents per forty-quart can. The bulk of the cream was sold by defendant to Breakstone Brothers, of Walton, N. Y., dealers in storage cream and manufacturers of cheese. It takes 960 pounds of three and five-tenths per cent milk to make a forty-quart can of forty per cent cream. So it would have been a simple matter, as bearing upon proper classification, having the quantities and the prices received and the dates of sales, to determine what the defendant actually received for this cream. From this, of course, would have to be deducted his storage charges, the expense of delivering to the storage warehouses, the interest on the money paid for the milk to the time of sale, and other proper deductions, from which a fair calculation could have been made as to what was a proper classification, or whether a wrong classification had been made. In these dealer to dealer transactions, these are elements to be considered; otherwise, the regulations might prove to be confiscatory in character. Nothing of the kind was done by the auditors of the Milk Control Board, and no evidence in that respect has been presented here. On the contrary, the testimony here, as on the revocation proceedings, shows that the auditors relied solely upon the assumptions and presumptions of the official orders.

Having relied upon the audits of the Milk Control Board or Division of Milk Control as the basis of his claim, and having offered no evidence, the plaintiff's case rests upon the validity of the official orders and upon the findings of the Director of the Division of Milk Control in the revocation proceedings.

In his application for a license the defendant agreed to abide by the orders of the Milk Control Board. This of course meant

that he agreed to abide by the *lawful* orders of said Board. The defendant had a right to assume that he would not be called upon to obey orders of the Board which were beyond their power to make, because he knew that the Board's conduct was limited by the law governing its creation, and he had a right to assume that the Board would not make unauthorized orders.

Price-fixing orders by a board or agency set up for the purpose and authorized by the Legislature to perform the ministerial function of fixing rates or prices are always subject to review by the courts as to (1) whether the orders themselves are within the powers granted by the Legislature to such agency; (2) whether, as made, they are reasonable, or operate to work a violation of section 6 of article I of the State Constitution and the Fourteenth Amendment to the Federal Constitution, and (3) whether grants of powers to such agency constitute a delegation of legislative as distinguished from an administrative power. These questions have been sufficiently considered by this court in the case of *Cline* v. *Consumers Cooperative Gas & Oil Company, Inc.* (152 Misc. 653).

The power to license milk dealers was lodged in the Milk Control Board by the Milk Control Law of 1933, and the validity of that power is not under attack here. This licensing power had been exercised under the Agriculture or Farms and Markets Law many years before the Milk Control Board came into existence; a license had been granted to the defendant, and at the time when the events involved here occurred he was operating under such license, and he was bound by the Milk Control Law and by all lawful orders of the Milk Control Board or Division.

The Milk Control Law provides the remedies which may be resorted to by the Commissioner of Agriculture and Markets in case of violation of the Milk Control Law or orders of the Milk Control Board issued thereunder. (§ 258-e.)

Article III " of this chapter" (Agriculture and Markets Law), at section 41, provides that a person who by himself or another violates any of the provisions of this chapter or of any other law the enforcement of which is within the jurisdiction of the department, is guilty of a misdemeanor. The provision formerly contained the words " or of any lawful rule of the department." It is significant that these words were eliminated; so that the remedies which remain are as follows:

(1) Where the violation is of the provisions of the law itself, one may be prosecuted for having committed a misdemeanor. (§ 41.)

(2) The Commissioner may elect to proceed at law or in equity to enforce compliance with the provisions of the statute and also with his rules and orders; or,

(3) He may apply for relief by injunction; or,

(4) " The Commissioner may  *  *  *  revoke a license  *  *  * upon due notice and opportunity of hearing to  *  *  *  the  *  *  *  licensee, when he is satisfied of the existence of any of the following reasons:" (Then there are set forth the grounds of revocation, lettered a to m, both inclusive.) (§ 258-c.)

(None of these grounds formed the basis of the proceeding to revoke defendant's license.)

At the end of this section (now 258-c), formerly subdivision 3 of section 308, on revocation, is added the following general provision: " The Commissioner may grant or renew a license or may decline to suspend or revoke a license conditionally upon the agreement of the licensee or applicant to do or omit to do any designated act, but such condition must have some appropriate relation to the administration of this article or of article twenty-one-a of this chapter," i. e., by this it would seem that the Commissioner may set up other grounds for revoking a license than those so carefully enumerated in the law, or threaten the licensee with punishment unless · he agrees to do something prescribed by the Commissioner.

The order revoking the defendant's license was dated January 22, 1935, and was absolute; and the application for the extension of his license was denied unless he, on or before a time fixed and in a particular manner, should pay his producers a sum of about $55,000. It was based upon a memorandum signed by Kenneth F. Fee, " Director, Division of Milk Control," and dated January 21, 1935, which, so far as pertinent here, reads as follows:

" The evidence shows that on January 25, 1934, a summary of an audit covering the operations of the applicant for the period April 16, 1933, to November 30, 1933, was sent to the applicant, that on May 25, 1934, a summary of an audit covering the period December 1, 1933, to January 31, 1934, was sent to the applicant, and that on July 20, 1934, additional information bringing the audit up to March 31, 1934, was supplied to the applicant. On each occasion the applicant was requested to inform the Division of Milk Control whether upon checking the computations any evidence of error was discovered.

" On September 5, 1934, there was a conference between Mr. Rosasco, Mr. Gross, and the Director of the Division of Milk Control. It was then definitely agreed that not later than October 5 certain information would be supplied, including informa-

tion to support the applicant's contention that the milk was used in classes lower than those in which it had been placed by our auditors. Some of the information was submitted before the notice of hearing was sent to the applicant, *but no adequate information with respect to the utilization of milk had been supplied.*

" *On the basis of the audits made by representatives of the Division of Milk Control, information concerning which has been supplied to the applicant,* the amount of underpayment for the period May, 1933–March, 1934, inclusive was indicated as $44,931.52. From the representations made by the applicant, it would seem that its contention is (1) that underpayments for the last half of the month of May, 1933 were offset in part at least by the payment of more than the required amount during the forepart of that month; (2) that milk or cream was ultimately so utilized as to justify its classification in brackets permitting settlement on the basis of a lesser price per hundred pounds than required to be paid upon the basis of the auditors' classifications; (3) that the applicant was entitled to an off-rail differential at one of its plants.

" After carefully considering all of the facts, there seems to be a measure of justification in the applicant's contention with respect to payments for milk received in May, 1933, and it is recommended that allowance be made on this count.

" No proof *regarded as satisfactory* has been presented with respect to the applicant's desire to have milk placed in lower price classes."

Then there is stated the finding as to the underpayment covering the period from May 16, 1933, to and including the month of September, 1934, the total of which was $55,333.32. " The record in this case shows that the applicant was given ample opportunity *to submit proof of any inaccuracies in the audits.* The applicant seems to have made no attempt to do this for a period of several months, and as already indicated, the information finally supplied was not regarded as of sufficient weight to counteract *the careful and painstaking work done by the auditors of this Division.*"

Then follows the recommendation, as follows: " It is recommended that the conditional license heretofore issued to the Estate of John E. Rosasco, John B. Rosasco, Administrator, be revoked, and that the revocation become effective in thirty days, provided, however, that in case the applicant shall make an additional payment to the producers in the total sum indicated above, or shall make definite arrangements to make such payment on or before a date to be agreed upon by the Commissioner, that the order revoking the license be suspended."

From this memorandum the following appears: (1) That a hearing was had; (2) that the auditors had furnished their views as to underpayments; (3) that the defendant herein failed to submit proof as to the uses to which the stored cream had been put by those to whom he had sold it; in other words, that *suppositions or presumptions* set forth in the orders fixing prices were used as a basis of determining the amount of underpayments; (4) that as a condition to the suspension of the order of revocation the defendant was required to pay the sum of $55,333.32 to his producers.

Now it is obvious that when defendant sold and delivered his cream to another dealer the title thereto passed out of the defendant, and that he had no control over the use to which it might be put by the purchaser, and no power to compel the purchaser to disclose to him such use. On the other hand, the purchaser of defendant's cream was a licensee of the Milk Control Board, and his books, accounts and records were subject to examination, not by the defendant but by the Division of Milk Control, subject to its subpœna and bound by its lawful orders. In this connection it is significant that section 256 of article 21 amended section 306 of the original act as to entry and inspection by adding thereto the following: " or where milk or milk products are being bought, sold or handled, or where the books, papers, records or documents relating to such transactions are kept, and shall have power to inspect and copy the same in any place within the State, and may administer oaths and take testimony for the purpose of ascertaining facts which in the judgment of the Commissioner are necessary to administer this chapter."

Defendant's storage cream which is involved here was sold by him to Breakstone Brothers, Inc., a subsidiary of Sheffield Farms, Inc. This company did deal in storage cream and did use it for the manufacture of cream cheese. The defendant had the right to sell his cream to another dealer; he could not control the use to which such purchaser put the cream.

As to the order, the defendant contends:

(a) That the schedule as to underpayments, which is the only evidentiary basis (excepting, as above noted, as to the months not covered by the schedule) of the amount of plaintiff's damage, is incompetent as a piece of evidence to show the amount of plaintiff's damage; and

(b) That there is no competent evidence upon the revocation hearing upon which to base the schedule of underpayments.

The plaintiff was not a party to the revocation proceeding, and the action of the Division of Milk Control was not *res adjudicata*

in this respect as to him, unless it could be held that it was his representative; if it were, we would have the anomalous situation of making a party to a proceeding a judge of aw and fact in his own case. And if it is not *res adjudicata* as to one party to this action, how can it be held to be *res adjudicata* as to the other?

I am of the opinion that the order, and the ev dence itself, was incompetent certainly as binding upon either party in determining the amount of damage. The record will show that it was only received as a piece of evidence in determining what, if any, was the fair and reasonable value of the milk sold by the plaintiff to the defendant at the time of its sale, and as to whether or not the defendant had paid such fair and reasonable value, taking into consideration the price-fixing orders.

However this may be, and recognizing that, even as limited, the admission of the record may be subject to criticism, let us consider the other question, (b), on the assumption that the evidence is competent to determine the amount of alleged underpayment. While I appreciate that th·s order revoking defendant's license is subject to review by certiorari, I think that I may inquire into the record of the hearing to determine whether there is any evidence to justify the findings as to underpayment, for the reason that these findings are the sole basis of plaintiff's damages. If there be no competent evidence to sustain the schedule of underpayments, then it is a nullity, and the order of revocation itself is a nullity if solely based upon such schedule.

The hearing in the proceeding was commenced December 4, 1934, and was presided over by Kenneth F. Fee as Director of the Division of Milk Control. At the hearing there appeared, for the Department of Agriculture and Markets, its own assistant counsel, R. G. Blabey, and L. L. Clough, supervising auditor; the defendant was represented by the Hon. James T. Cross, who was counsel for the Pitcher Legislative Committee, which made the investigation and report upon which the Legislature acted in enacting the Milk Control Law. The defendant was ably represented by one who understood the problem and who was on the lookout at all times to note whether or not any evidence was presented which would justify an order of revocation.

Mr. Blabey announced the appearance in the proceeding of Elmer H. Royce, the plaintiff herein, who stated that he was representing the farmers delivering milk to defendant's three stations at Camden, Westdale and Poland.

A doctor's certificate showing the illness of Mr. Rosasco, the defendant here, was produced, and Mr. Cross made strenuous objection to the admission of any evidence in the absence of his client.

Mr. Blabey stated: " I feel that the State of New York should not be thwarted in its efforts to regulate its greatest industry by the sickness of a single individual in an organization which certainly must have others who are acquainted with its books and records and its methods of conducting affairs."

Official orders No. 17 (as amended by official order No. 19), No. 32 and No. 58 were offered and received in evidence; and then the hearing was adjourned to a later date, on which date the appearances are noted as follows: " For the department: Mr. Blabey, assistant counsel; Andrew H. Bell, Jr., hearing deputy; L. L. Clough, supervisor of auditing; Edward Nykerk and Raymond Duerr, auditors. For the conditional licensee: James T. Cross and John B. Rosasco, in person."

I have carefully examined the record of this hearing. Considerable evidence was offered. In the afternoon Mr. Rosasco stated that he was ill; that he was at the hearing against his physician's advice. Mr. Cross consented to go on in the absence of Mr. Rosasco, provided he could have a transcript of the record so that he could go over it with him.

Mr. Fee: That would mean further delay. In addition, Mr. Royce, representing the producers, is here at some expense, and we would like to finish it tomorrow.

Mr. Cross asked for an adjournment on account of the illness of Mr. Rosasco, " so that he may be present at the trial, which involves important property interests of the estate of which he is the administrator."

This application was denied.

The auditors told of the changes in classification made by them, and their audits were offered in evidence.

Mr. Cross: Objected to as incompetent, immaterial, irrelevant, no foundation laid.

Mr. Fee: It seems to me it was incumbent upon Rosasco to supply clear proof in case any of this cream was used in a class other than 2-A. Apparently there was no such proof, and it seems to me that the auditors went out of their way to see if they could find some and did not succeed. Under the circumstances, I see no reason why the audits should not be received.

By Mr. Cross (to an auditor): Q. And in all these instances where you changed the classification to higher-priced brackets, you disregarded the sworn statement of the J. Rosasco milk concern on file in this Department? A. Well, we had to disregard it. Q. And you did disregard it? A. Yes.

Mr. Cross: The licensee claims his own books and records, evidenced by sworn statements presented to this department and

on file in this department, show clearly that the classifications are correct under which he paid his producers and that the burden is upon the State to show by proof to the contrary in the event that it seeks to place an added burden on him or to interfere with his rights or property interests.

Mr. Fee: ·It does not seem to me that the licensee has presented any clear proof to support his claim for lower classification, used in the form of· cream, than the 2-A classification. (The question was as to the sworn reports of the disposition of milk by the licensee, and as to whether the Division of Milk Control did not have to take these reports into consideration.)

This colloquy took place:

Mr. Fee: It seems to me that it's useless to go at this matter in this way, when the reports have to be referred to and read from all the while.

Mr. Cross: Isn't it elementary, Mr. Director, that you take judicial notice and cannot avoid the responsibility of taking notice of the files in your own Department and in the Division over which you are the Director?

Mr. Fee: I don't think there's any question about that. On the other hand, if the Commissioner reaches the decision based upon those things and they don't appear as a part of the record, and the decision is reviewed, then there's a question as to whether the courts will take judicial notice of those things.

Mr. Cross: The only one that could take objection to the failure to introduce in the record the written evidence of the information as to which I am interrogating the witness on cross-examination, in my opinion would be the licensee. This is not my witness; this is the State's witness. And if the State's witness, on cross-examination, is giving me erroneous testimony, certainly the counsel for the State, having access to the files, will be in shape to correct the record and correctly advise the director or the court, or both, as to the facts.

Mr. Fee: Then do I understand that no question will be raised either as to any decision reached by the Commissioner or as to the facts considered by him, including these reports, which you suggest he may take judicial notice of, either now or later?    -

Mr. Cross: I don't know what the Director may understand, but it's my intention to lead the Director to an understanding that I will raise no question about the accuracy of the statement of this witness on cross-examination with respect to a report that he produces for my inspection, and from which he purports to state the number of outlets for the licensee for any given period.

A careful examination of the record on this hearing shows not a scintilla of evidence to justify the findings as to underpayments, excepting the arbitrary action of the auditors in making their reclassification as to use, based solely upon the illegal assumption or presumption provisions of the official orders hereinbefore considered. There being no evidence upon which to base the said findings, it follows that they are a nullity and of no value as evidence in this case; and it also follows that every action of the Commissioner of Agriculture and Markets based thereon is a nullity.

The Milk Control Board sought to change the rules or the law of evidence governing in this State, an act which was beyond its power to do. The Director of the Division of Milk Control, as he presided in a supposedly quasi-judicial position over this hearing, owed the duty to obey the law of the land, and the Commissioner of Agriculture and Markets owed the duty, if he would lay a foundation for the revocation of defendant's license, to prove his charge by competent evidence.

The Milk Control Law does not authorize the Milk Control Board to become a collection agency for the farmers of the State; nor does it grant any power to the Division of Milk Control to exercise any of the equity powers of the Supreme Court, or any authority to issue oppressive orders, or to render judgments, or to impose fines. In effect, the Division of Milk Control said to the defendant: " You are fined $55,333.32, and unless you pay the fine your license will be revoked; you may pay the fine to your producers." Here, in revocation proceedings, we have bureaucracy carried to the nth degree. *First*, the Milk Control Board (now the Commissioner of Agriculture and Markets) determines what is reasonable notice and publicity for a price-fixing hearing; *i. e.*, it determines the basis of its jurisdiction. *Second*, it classifies milk according to use; it fixes prices for each class by official orders. *Third*, it issues licenses to dealers. *Fourth*, in case of revocation, it must give hearings; these presided over by the Milk Control Director, its or his appointee. *Fifth*, it legislates to set aside common-law rules of evidence and to change the common-law burden of proof. *Sixth*, its or his appointee is judge of law and fact. *Seventh*, it or he has the power to revoke a license. *Eighth*, it in effect, by its conditional revocation, levies a fine. Here we have the law-making power, executive power and judicial power all combined in one body — a most perilous status, contrary to American principles in government.

In this particular case there is an attempt to exercise equity powers of a type that only under the most extraordinary condi-

tions, and never under such conditions as these, would even a court of equity attempt to exercise. In effect, it has rendered judgment in damages, and, having no power to issue execution, tries to collect the amount for farmers by threatening a revocation of a license unless the amount is paid within a few days.

There is no doubt about the power of the Division of Milk Control to issue and in a proper case to revoke a license, but there is no basis whatsoever in law for the Board to render judgment for $55,333.32 and to say "your license will be revoked unless you pay the judgment." Section 258-c gives no such power.

The auditors changed the classifications from those shown by the defendant's records and verified reports, simply by reason of the provisions of the official orders. The effect is this: We find you guilty upon the presumptions or suppositions set up in our official orders; you have a right to prove your innocence; if you fail to do so, our auditors' determinations are conclusive.

The difficulties inherent in the application of the official orders to dealer to dealer transactions have been noted; but mere difficulty in administration is not a basis for creating a revolution in substantive law and practice.

There is no charge, nor is there a scintilla of evidence, of any fraudulent conduct on the part of Mr. Rosasco, of any falsification of his records, or of any intent or purpose or conspiracy to defraud. I can come to no other view than that the defendant has been made a victim of arbitrary and capricious action.

This controversy arose over cream that was stored for months before it was sold by Rosasco; he could not at the time he paid his producers determine the use to which it was to be put; and, from a practical standpoint, it seems to me that he was justified in classifying the milk as 2-E, subject to review as to what was a proper classification, after he had sold the cream. Under no circumstances could it be classified as 2-A milk. If classified as 2-C milk, and if it was ultimately used as 2-E, and the defendant had paid his producers on a 2-C basis, how could he have recovered from his producers on account of any overpayment?

Now the revocation of a license to an estate, the creator of which had been engaged for many years in purchasing milk from producers and disposing of the same, and had built and maintained for many years three receiving stations, was a very serious matter, involving large property rights, not only affecting the value of plants built for the purpose of receiving and handling milk, but also the business itself, built up after many years of operation.

We have lived in this country under the common law up until now, and this law, excepting as modified by legislative enactment, is, under the Constitution of the State, still controlling. Two fundamental principles distinguish this law from what is known as the civil law: (1) The presumption of innocence until there be proof of guilt; (2) that he who would seek to recover damages from another has the burden of proof and the duty to satisfy the court or tribunal, by a fair preponderance of the evidence, as to the truth of those facts which he must prove in order to recover; our law, as to fundamental rights, has not been based upon supposition or presumption. Under our rules of evidence there are presumptions or inferences to be legally inferred from established facts, but there are no presumptions used to establish the necessary facts from which legal inferences are to be drawn.

There are no common-law presumptions applicable to this case or to the revocation proceeding. There is no provision in the statute creating the Milk Control Board or the Division of Milk Control which authorizes the provisions contained in these official orders as to supposition or presumption. Therefore, it was beyond the power of the Milk Control Board to incorporate these suppositions or presumptions in the official orders fixing prices, as a basis for classifications of milk.

In proceedings to revoke a license there must be no unreasonable arbitrary action or tyrannical action; nor may such proceedings be invoked for purposes of punishment, but only in the exercise of police powers to protect the public health, safety or welfare, none of which appears to be involved in this proceeding. There is no evidence that the defendant was an incompetent or improper person to operate his receiving stations.

I am not unaware of the difficulties as to proof with which the Milk Control Board was confronted, both by reason of the complexity and the ambiguity of the law itself, its novelty, and the difficulty of establishing rules for the enforcement of it, especially in the presence of the necessity for prompt action. So far as the official orders divided milk into different classes, the difficulties were inherent in the orders establishing different classes. But mere difficulties as to proof do not justify disregard of fundamental laws of evidence or failure to prove by competent evidence. The Director, who was chairman of these revocation hearings, was not a lawyer, and is not chargeable with having done any intentional wrong or with being actuated by any animus; he was following the chart and methods laid down in the official orders; once those were adopted, he could scarcely do otherwise than he did.

Where there were large dealers and distributors, such as Bordens, the Sheffield Farms, Inc., and the Dairymen's League Co-operative Association, who were equipped to adjust themselves as to the uses to which milk received could be put, and had plants for the manufacture of milk into various products, their records would readily show just what disposition was made as to use of the milk purchased by them. These organizations purchase the major proportion of fluid milk which is distributed in the Metropolitan area; whatever excess there may be over requirements for fluid milk they manufacture into milk products.

This is not true as to a dealer such as is the defendant here, who apparently is confined to distribution of fluid milk or cream. He filed with the Milk Control Board his report showing, under oath, classifications as to use; there was no presumption that he made erroneous reports; there is no charge and no presumption that he has been guilty of fraudulent conduct. There is no warrant whatsoever, on the evidence on these revocation hearings, for a finding that the defendant herein owed his producers $55,333.32.

This revocation proceeding is important here because the plaintiff has chosen to base his proof as to damages upon the schedule attached to the revocation order, and, as to milk not included in this schedule, upon the reports and testimony of the auditors of the Division of Milk Control, based upon the same provisions of the official orders as to *supposition or presumption as to the classification of milk.* This evidence furnishes no proof of damages.

For the foregoing reasons, the motion made at the close of the evidence, for a nonsuit and a dismissal of the complaint, is granted, without prejudice.