**IDEAL FARMS, INC. and Franklin Lakes Dairy Producers, Inc., Plaintiffs,**

v.

**Ezra Taft BENSON, Secretary of Agriculture of the United States of America, Defendant.**

**IDEAL FARMS, INC., Garden State Farms, Inc., Franklin Lakes Dairy Producers, Inc., and Ideal Farms Dairy Products, Inc., Plaintiffs,**

v.

**Ezra Taft BENSON, Secretary of Agriculture of the United States of America, Defendant.**

**Civ. A. Nos. 1295-58, 98-59.**

United States District Court
D. New Jersey.
Feb. 10, 1960.

Edward G. Weiss, Paterson, N. J., Daniels & Swope, Harrisburg, Pa., of counsel,. for plaintiffs, by Willis F. Daniels, Harrisburg, Pa.

Chester A. Weidenburner, U. S. Atty., by Charles H. Hoens, Jr., Asst. U. S. Atty., Newark, N. J., for the Government.

WORTENDYKE, District Judge.

Each of these cases is before this Court. pursuant to the provisions of subsection 15(B) of section 8c, (7 U.S.C.A. § 608c (15) (B), ) of the Agricultural Adjustment Act of 1933, as amended, re-enacted and amended by the Agricultural Marketing Agreement Act of 1937, as amended, 7 U.S.C.A. § 601 et seq., hereinafter referred to as the Act. The cases have been consolidated here because they arise from consolidated proceedings in the Department of Agriculture, Dockets A.M.A. 27–120 and 27–122. Plaintiffs complain of the action of the defendant, by his Judicial Officer, hereinafter referred to as Secretary, in dismissing plaintiffs' petitions, filed under subsection 15(A) of the Act, to revoke certain sections of Milk Marketing Order No. 27, promulgated by the Secretary on June 10, 1957 to take effect August 1, 1957. In A.M.A. 27–120 below, plaintiffs

named in Civil 1295–58 here, attacked the validity of section 927.65 of Order No. 27 "insofar as it requires the milk of producer-distributors to be equalized for those located in Northern New Jersey." In A.M.A. 27–122 below, plaintiffs named in Civil 98–59 here, attacked sections 927.3, 927.40 and 927.71 of the same Order "insofar as they include any part of Northern New Jersey in the Marketing Area" of the Order. The record of the proceedings before the Hearing Examiner and Judicial Officer of the Department comprises some 16,000 typewritten pages, exclusive of pleadings and exhibits. While the subsection, 15(A) proceedings were still pending before the Secretary, Ideal Farms, Inc. prematurely urged, in opposition to the Government's action to compel its compliance with section 927.77 of the same Order (No. 27), its present contentions of administrative procedural irregularity in the adoption of the Order, and lack of statutory authority for the Order's requirement that handlers who are also producers make payment to the Producer Settlement Fund based upon so much of the milk handled by them as they obtain from their own farms. See United States v. Ideal Farms, Inc., D.C.N.J.1958, 162 F.Supp. 28, affirmed 3 Cir., 1958, 262 F.2d 334.

Plaintiffs in both actions are New Jersey corporations. In the earlier, hereinafter called No. 1295, the plaintiffs are two in number, Ideal Farms, Inc., referred to as Ideal, and Franklin Lakes Dairy Producers, Inc., referred to as Franklin Lakes. In the other action, No. 98, these two plaintiffs are joined by two others, Garden State Farms, Inc., called Garden State, and Ideal Farms Dairy Products, Inc., referred to as Ideal Products. All plaintiffs operate in the northern part of New Jersey, which area was, for the first time, by the provisions of the Order as amended, made a part of a Milk Marketing Area. Ideal is a milk handler, as defined in § 608c(1) of the Act and in § 927.7 of the Order. That corporation operates a processing and bottling plant in Paterson, New Jersey, from which milk is distributed to retail and wholesale purchasers. Ideal buys no milk from other dairy farmers or producers, but does handle and sell milk produced on farms which it rents, and also buys milk from other milk plants. Franklin Lakes is also a milk handler, operating a milk receiving plant in Wantage, New Jersey, where it collects milk from dairy farms owned by others, together with milk produced on its own farms, and thereafter sells it to other handlers. Ideal Products is a handler of milk which it buys from producers and sells to other handlers. Garden State is a handler which receives milk from producers and other handlers, processes, bottles and sells it to purchasers within the marketing area defined in Order No. 27.

All of the plaintiffs complain of alleged denial of due process in the administrative proceedings which resulted in the adoption of the Order, and Ideal and Franklin Lakes contend that the provisions of § 927.65 of the Order, insofar as they may be construed to require the pooling and pricing of milk moved to a handler's plant from such handler's own farms, are not authorized by the Act and find no support in the evidence before the Secretary.

Because they involve similar questions of law, these cases have been consolidated (Rule 42(a) F.R.Civ.P., 28 U.S.C.A.), and, because no genuine issues of material fact appear, the purely legal questions raised by the pleadings are presented by cross-motions for summary judgment under F.R.Civ.P. 56. See Wawa Dairy Farms v. Wickard, 3 Cir., 1945, 149 F.2d 860.

Plaintiffs' contentions are stated in their consolidated brief on these motions, as follows:

(1) "Imposition of section 927.3, and section 927.65 of Order No. 27 upon the north Jersey area and these plaintiffs is invalid in that there was a lack of due notice of the hearing and improper use of the record by the Secretary as well as improper rulings and orders by the

hearing examiners and the Judicial Officer."

(2) "Pooling and pricing regulations of handlers' own farm production is beyond the authority granted to the Secretary of Agriculture by the statute."

Order No. 27, as originally promulgated by the Secretary on August 5, 1938, covered the New York metropolitan milk marketing area (7 C.F.R. §§ 927.1–927.-89, Rev. 1952), and established "a formula under which distributors of milk thereby regulated account to producers at a minimum price which varies according to the geographical area in which the milk is delivered to the purchaser by the distributor." Fahy, J., in United Milk Producers of New Jersey v. Benson, 1955, 96 U.S.App.D.C. 227, 225 F.2d 527, 529. As stated in the cited case, the basic purpose of milk marketing orders promulgated and administered under the Act is "to stabilize the price of milk, in aid of both producers and distributors or handlers, and to maintain orderly marketing conditions." United States v. Rock Royal Cooperative, Inc., 1939, 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446, and H. P. Hood & Sons, Inc. v. United States, 1939, 307 U.S. 588, 59 S.Ct. 1019, 83 L.Ed. 1478, are there cited as upholding the validity of the Act and of particular marketing orders made pursuant thereto. No impropriety in the administrative proceedings which promulgated the Order was asserted or considered in the United Milk Producers case, supra.

By the provisions of the Act, 7 U.S.C.A. § 608c(1) and (2), the Secretary is directed not only to issue, but from time to time to amend orders applicable to persons engaged in the handling of milk (handlers) in the current of or which directly burdens, obstructs or affects interstate commerce. Subdivision (3) of the same section directs that the Secretary, whenever he has reason to believe that the issuance of an order will tend to effectuate the declared policy of the Act with respect to milk, "shall give due notice of and an opportunity for a hearing upon a proposed order."[1] Section 608c(11) prohibits issuance of an order relating to a commodity which is applicable to all production or marketing areas, or both, unless the Secretary finds that "the issuance of several orders applicable to the respective regional production areas or regional marketing areas, or both, as the case may be, of the commodity * * * would not effectively carry out the declared policy" of the Act.

Plaintiffs base their assertion that their inclusion in the Order, by the provisions of § 927.3 thereof, is illegal upon the alleged insufficiency of notice to them that the scope of the Secretary's hearing might include the consideration of an amendment or revision of the existing Order No. 27 to extend its regional coverage to northern New Jersey. Such contention is without support in law or fact. The record of administrative proceedings in each of these cases discloses adequate compliance with 5 U.S.C.A. § 1003 and with part 900.4 of Title 7, Code of Federal Regulations relating to Agricultural Marketing Agreements and Orders.[2]

In his statement of principles on proposed new milk marketing regulation in

1. The policy of Congress is declared in 7 U.S.C.A. § 602, and is summarized in United States v. Rock Royal Cooperative, Inc., 1939, 307 U.S. 533, 574, 59 S.Ct. 993, 1013, 83 L.Ed. 1446, as being "to establish and maintain such orderly marketing conditions for agricultural commodities in interstate commerce as will establish prices to farmers at a level that will give agricultural commodities a purchasing power with respect to articles that farmers buy, equivalent to the purchasing power of agricultural commodities in the base period * * *." (August 1909 to July 1914 or August 1919 to July 1929.)

2. Section 4(a) of the Administrative Procedure Act, 5 U.S.C.A. § 1003(a) provides:

"(a) General notice of proposed rule making shall be published in the Federal Register (unless all persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law) and shall include (1) a statement of the time, place, and nature of public rule mak-

the New York-New Jersey area, published December 31, 1955 (20 F.R. 10167), the Secretary invited interested parties to submit proposals for embodiment either in a single order covering both areas or in a separate order for New Jersey alone. On May 25, 1956 there was published (21 F.R. 3537) a notice of hearing on proposals for a separate new milk marketing order for northern New Jersey. This notice was supplemented by one published June 6, 1956 (21 F.R. 3799), which announced that the subject matters of the hearing would be the handling of milk in the New York Metropolitan Milk Marketing Area and a proposed marketing agreement and order regulating the handling of milk in the Northern New Jersey Milk Marketing Area. The noticed hearing was convened at Newark, New Jersey, on June 18, 1956, and during its course a motion was made to expand the agenda to include consideration of a comprehensive order to combine regulation of milk handling in metropolitan New York and in northern New Jersey. This motion, after argument, was denied by the Secretary on June 25, 1956. The hearings under the original notice continued intermittently until recessed on December 20, 1956, but they were reconvened March 5, 1957, in New York City, pursuant to notice of call by the hearing examiner, duly published in the Federal Register on February 27, 1957 (22 F.R. 1128). A press release issued by the Secretary February 21, 1957, announcing that the reconvened hearing would be open for submission of

evidence on a single marketing order for the Metropolitan New York-Northern New Jersey Areas was confirmed by a supplemental notice of hearing published in the Federal Register on February 28th (22 F.R. 1219). Motions attacking the timeliness and propriety of the latter notice were made to and overruled by the hearing examiner on March 5, 1957, and the hearings continued for eighteen more days, with participation therein by the present plaintiffs and their attorneys, until concluded on March 29, 1957.

Section 900.4 of Rules and Regulations adopted by the Secretary pursuant to Section 10(c) of the Act (7 C.F.R. 900.4) requires that "[t]he notice of hearing shall contain a reference to the authority under which the marketing agreement or marketing order is proposed; shall define the scope of the hearing as specifically as may be practicable; shall contain either the terms or substance of the proposed marketing agreement or marketing order or a description of the subjects and issues involved and shall state the industry, area, and class of persons to be regulated, the time and place of such hearing, and the place where copies of such proposed marketing agreement or marketing order may be obtained or examined. The time of the hearing shall not be less than 15 days after the date of publication of the notice in the Federal Register, * * * unless the Deputy Administrator shall determine that an emergency exists which requires a shorter period of notice, in which case the period of notice shall be that which

ing proceedings; (2) reference to the authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved. Except where notice or hearing is required by statute, this subsection shall not apply to interpretative rules, general statements of policy, rules of agency organization, procedure, or practice, or in any situation in which the agency for good cause finds (and incorporates the finding and a brief statement of the reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest."

Section 7 of the Administrative Procedure Act, 5 U.S.C.A. § 1006, provides:
"In hearings which section 1003 or 1004 of this title requires to be conducted pursuant to this section * * * (c) Except as statutes otherwise provide, the proponent of a rule or order shall have the burden of proof. Any oral or documentary evidence may be received, * * * and no sanction shall be imposed or rule or order be issued except upon consideration of the whole record or such portions thereof as may be cited by any party and as supported by and in accordance with the reliable, probative, and substantial evidence. * * * "

the Deputy Administrator may determine to be reasonable in the circumstances: Provided, That, in the case of hearings on amendments to marketing agreements or marketing orders, the time of the hearing may be less than 15 days but shall not be less than 3 days after the date of publication of the notice in the Federal Register." (See also footnote 2 supra). It appears to be the contention of the plaintiffs that the entire Order No. 27 is invalid as to them because (a) they had insufficient notice that the contemplated regulation of milk marketing for northern New Jersey would be achieved by a territorial enlargement of the scope of the existing New York metropolitan order of the same number, instead of the originally contemplated separate order for the New Jersey area, and (b) the provisions of the single comprehensive order, of which they presently complain, cannot legally derive support from evidence adduced upon hearings held pursuant to the original notice of May 18, 1956, and (c) they were precluded from presenting evidence upon the hearings which reconvened on March 5, 1957, which might have exempted them from the impact of the comprehensive order insofar as it required handlers to account to the producer settlement fund for milk which they produce upon their own farms. In short, plaintiffs insist that the hearing noticed on February 27, 1957 was a promulgation hearing, contemplating a new regulatory order project rather than an amendment or modification of that scheme of regulation which had been under consideration by the Secretary since his published statement of December 15, 1955, and hearing notice of May 18, 1956. Plaintiffs' attack upon the Order as a whole is obviously in aid of that upon the provisions of § 927.65 thereof which the plaintiffs contend are beyond the authority delegated by the Act "insofar as this Section attempts to require the pooling and pricing of milk moved to a handler's plant from such handler's own farm" (plaintiffs' brief, p. 32). We shall examine plaintiffs' contentions in the order of their statement of the legal questions which they present.

### Sufficiency of Notice

■ The supplemental notice of hearing published February 28, 1957, to be convened March 5, 1957, for the first time announced the Secretary's intention to regulate northern New Jersey by a comprehensive order including metropolitan New York, whereas 12,000 pages of testimony had by then been taken at 84 sessions in contemplation of embodying the New Jersey regulation in a separate order. The notice of February 28, 1957 also announced that support for the proposed comprehensive order would be sought in the evidence already presented, as well as in that to be taken pursuant to the hearing there noticed. Because the comprehensive order for the first time placed under regulation thousands of New Jersey milk producers and hundreds of New Jersey milk handlers, it is plaintiffs' insistence that the supplementary notice of February 28 must necessarily have constituted a call for a "promulgation" hearing for March 5, not a hearing upon a proposed amendment, and that such notice, being less than the fifteen day minimum prescribed by Section 900.4 of the Rules and Regulations under the Act, was inadequate and therefore rendered the subsequent order invalid. We cannot agree with this conclusion.

■ On May 25, 1956 notice was published in the Federal Register that public hearings would be held, commencing June 18, 1956, "for the purpose of receiving evidence with respect to the economic and marketing conditions relating to the handling of milk in a proposed Northern New Jersey milk marketing area." (21 F.R. 3537). Among the provisions proposed for inclusion in the Order referred to in the notice were the following:

(1) "Handler" is defined as "any person who engages in the handling of milk or products therefrom, which milk was received at a pool

plant, or at a plant approved by any health authority as a source of milk for the marketing area." (§ 927.7, 21 F.R. 3559), (§ 7, 21 F.R. 3545).

(2) The market administrator is required to compute "the value of milk of producers disposed of by each handler." (§ 990.61, 21 F.R. 3540).

(3) Each handler is required to make payment to each producer, each month, for all milk delivered to him by such producer during the preceding month at not less than the uniform price (subject to certain differentials). (§ 927.65, 21 F.R. 3568), (§ 65, 21 F.R. 3553).

(4) Each handler is required to pay his debit balance monthly to the producer settlement fund in accordance with his account therewith. (§ 927.72, 21 F.R. 3569), (§ 73, 21 F.R. 3554).

A comparison of each of the foregoing provisions with certain of those in the existing (metropolitan New York) order reveals striking instances of similarity. The existing Order No. 27 indicates:

(1) "Handler" is defined in identical language. (§ 927.7)

(2) Each handler's pool debit or pool credit shall be computed by the market administrator by multiplying "the quantity of milk received by each handler from producers by the uniform price." (§ 927.79(a).)

(3) Each handler is required to make payment to each producer each month for all milk delivered by such producer during the preceding month at not less than the uniform price (subject to certain differentials). (§ 927.70.)

(4) Each handler is required to pay his debit balance monthly to the producer settlement fund in accordance with his account therewith. (§ 927.77.)

Thus, from May 25, 1956 until the hearings terminated on March 29, 1957, plaintiffs were upon full and continuing notice that they were to be subjected to the foregoing regulations, and were accorded plenary opportunity to produce evidence in opposition to the contemplated imposition thereof, and to cross-examine witnesses called by the proponents of such regulations. Whether the order in which such regulations would be incorporated was to be a separate one for northern New Jersey, or an enlargement of the scope of the existing order covering metropolitan New York was immaterial insofar as the impact of the regulations upon the plaintiffs was concerned. The record fails to disclose that the change in the vehicle selected, during the course of the hearings, for the promulgation of such regulations, in any degree more adversely affected, or could affect, the plaintiffs than would similar regulations embodied in a separate order. The supplementary notice of February 28, 1957 of the reconvening of the hearings on March 5, 1957, which had been recessed on December 20, 1956, was merely an amendment of the proposed form (not substance) of the order referred to in the original notice of May 25, 1956. The supplementary notice was within the time prescribed by the Secretary's Regulations, but if it were not to be so construed, the record discloses no prejudice to plaintiffs by reason thereof. As plaintiffs correctly point out, "until March 5, 1957, all the testimony and exhibits which pertained to the North Jersey problem were offered in support of or in opposition to the proposed provisions" of the order to be issued for New Jersey alone, and "upon this basis * * * the hearing proceeded through 84 sessions." The amplitude of notice of and opportunity to oppose the Secretary's obvious intention to regulate the marketing of plaintiffs' "own farm" milk was clearly apparent and available to plaintiffs, at least as early as May 25, 1956. Although the hearing examiner concluded that the hearing notice of May 18, 1956 limited the issue to that of whether or not "a separate new milk marketing order (should be adopted) for Northern New Jersey," he recognized that "the disira-

bility of a comprehensive order could * * * be shown in support of a contention that there should not be a separate order," that much testimony had been received for this purpose prior to March 5, 1957, and that "the area proposed to be regulated, the general type of regulation, etc., were always the same." Of eight proposals for the regulation of northern New Jersey milk marketing, which were attached to the hearing notice of May 18, 1956, four suggested that "own-produced" milk of handlers should be subjected to regulation. Administrative due process requires (1) opportunity to be heard, (2) due notice of hearing, (3) fair conduct of hearing, (4) support in the record for the decision, (5) submission of proposed findings in a tentative report, and (6) opportunity to file and be heard upon exceptions to such report. We agree with the conclusion of the Judicial Officer that on the basis of the entire record of the hearing, lasting 102 days, where approximately 16,000 pages of testimony was adduced, and the informal conferences, that plaintiffs were afforded a reasonable opportunity to prepare and to be heard. See United States v. Wrightwood Dairy Co., 7 Cir., 1942, 127 F.2d 907; Pearson v. Walling, 8 Cir., 1943, 138 F.2d 655. The administrative proceedings here under review were fully in accord with the requirements of due process emphasized in Morgan v. United States, 1937, 304 U.S. 1, 58 S.Ct. 999, 82 L.Ed. 1129.

### Use of Entire Record as Basis for Decision

■ It appears to be plaintiffs' contention that because the hearings held prior to March 5, 1957 were upon a proposed separate milk marketing order for New Jersey, as announced in the notice of May 18, 1956, the 12,000 pages of testimony presented at those hearings should not have been considered by the Judicial Officer in reaching his decision sustaining the comprehensive order proposed in the supplemental notice of February 28, 1957, upon which 4,000 additional pages of testimony were submit-

ted. This criticism could only have validity if the evidence recorded at the earlier hearings was irrelevant to any of the issues considered at the later hearings. The over-all scope of the hearings included consideration of three questions, viz.: (1) whether the northern New Jersey area should or should not be regulated; (2) whether such regulation should be separately imposed or in conjunction with the already regulated metropolitan New York area; and (3) in what provisions such regulation should be expressed. The initial notice of May 18, 1956 set forth eight regulatory proposals, each provision of which became a contested issue from the outset. The basic plan of regulation expressed in each proposal was similar to that ultimately adopted. The proposal of Mutual Federation of Independent Cooperatives, Inc., for example, recommended a separate order for northern New Jersey and a new Order No. 27, with similar provisions to accomplish the same result as the single comprehensive order of which plaintiffs now complain. Since the question of the regulation of handlers' "own-produced" milk was an issue from the beginning, plaintiffs' opportunity to cross-examine witnesses called by proponents of the regulation was continuingly available. Their failure, if any, to exhaust the opportunity to cross-examine before the vehicle of the regulatory project was changed to a comprehensive order does not spell out error in the Examiner's refusal to require recall of witnesses for further cross examination. Plaintiffs show no denial of due process in that aspect of the proceedings. The complete record of all of the hearing sessions was an appropriate basis for the ultimate administrative decision. I find no procedural impropriety which invalidates that decision. (See footnote 2 supra.)

### The Validity of § 927.65 of the Order.

■ As stated in their brief (page 32), the plaintiffs contend that the Act does not authorize the promulgation of § 927.65 (of Order No. 27) insofar as

this section attempts to require the pooling and pricing of milk moved to a handler's plant from such handler's own farm. They argue that because Section 8c(5) of the Act (7 U.S.C.A. § 608c(5)) prescribes "milk purchased" by handlers from producers as a factor in fixing minimum prices for and adjustments among handlers of milk, it follows that a milk marketing order may not "control" handlers' "own farm" milk (which is not "purchased" from producers).

In seeking in § 8c(5) of the Act alone for authority for the provisions of § 927.65 of the Order, plaintiffs improperly disregard other important statutory sections of the enabling legislation. Plaintiffs tacitly, if not expressly, concede that § 927.65 regulates handlers' "own-produced" milk. An examination of that section will indicate the propriety of that concession. In determining the net pool obligation of every handler *all milk received from producers* must be included as a factor. The handler's net pool obligation for each plant is computed as the sum of the products of the quantity of each class of milk received from producers at each pool plant, at the class price, with certain fluid skim differentials, less specified deductions for certain plants. From the computation of the handler's net pool obligation there is excluded (1) milk from certain New York sources; "(2) milk received at a handler's plant not in excess of an average of 800 pounds per day from such handler's own farm in the event that no milk is received at such plant from other dairy farmers, but is received from other plants"; and "(3) all milk received at a handler's plant from such handler's own farm in the event that no milk is received from any other source at such plant."

An example of the application of the foregoing formula for the calculation of the net pool obligation of handlers would appear from the following factual assumptions: We shall assume that Handler A and Handler B are the only handlers operating in their marketing area, and that each handles a monthly quantity of one hundred thousand pounds, all of the same classification. Handler A purchases milk from producers. The class price is $5 per cwt, after adjustment for differentials. Assuming no involvement of skim milk, calling for the application of a special computation, the handler's net pool obligation would be $5,000. Handler B, on the other hand, receives only 75,000 pounds of milk from other producers, producing the remaining 25,000 pounds on his own farms. According to the contention of the plaintiffs in the present case, Handler B's net pool obligation would be but $3,750. The effect of the plaintiffs' contentions upon the computation of the uniform price required to be paid into the producer settlement fund, under these circumstances, as provided by § 927.66 of the Order, would work out as follows: The two handlers would report to the Market Administrator their combined net pool obligation, viz., $8,750 (involving the distribution of 200,000 pounds of milk) and assuming that that amount had been paid into the producer settlement fund (disregarding for the moment the items mentioned in subdivisions (b), (c), (d) and (e) of § 927.66), the uniform price per cwt of milk would be the quotient of the aggregate net pool obligation divided by the "total pounds of milk delivered by producers." This would obviously result in $4,375 per cwt in lieu of the $5 contemplated by the Order. Because each handler, irrespective of whether he is also a producer and irrespective of the number of producers whose milk he receives and distributes, is required by section 927.70 of the Order to "make payment to each producer for all milk delivered by such producer during the preceding month at not less than the uniform price", it is obvious that an exemption of a dealer's "own farm" milk from calculation of his net pool obligation would reduce the uniform price which all producers are entitled to receive for milk of the same grade, under otherwise similar circumstances. Such a result, although obviously in the financial interest of the handler-producer, is

clearly contrary to the purpose and object of the Act.

The most comprehensive review and clearest explanation of the provisions of the Act is to be found in Mr. Justice Reed's opinion in United States v. Rock Royal Co-Operative, Inc., 1939, 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446, which sustained the validity of Order No. 27 when that Order regulated the handling of milk only within the New York metropolitan area. The necessity for and result of providing a uniform minimum price for fluid milk for all of the producers in the marketing area is described therein, 307 U.S. at page 550, 59 S.Ct. at page 1002, as follows:

"The market for fluid milk for use as a food beverage is the most profitable to the producer. Consequently, all producers strive for the fluid milk market. It is obvious that the marketing of fluid milk in New York has contacts at least with the entire national dairy industry. The approval of dairies by the Department of Health of New York City, as a condition for the sale of their fluid milk in the metropolitan area, isolates from this general competition a well recognized segment of the entire industry. Since these producers are numerous enough to keep up a volume of fluid milk for New York distribution beyond ordinary requirements, cut-throat competition even among them would threaten the quality and in the end the quantity of fluid milk deemed suitable for New York consumption. Students of the problem generally have apparently recognized a fair division among producers of the fluid milk market and utilization of the rest of the available supply in other dairy staples as an appropriate method of attack for its solution. Order No. 27 was an attempt to make effective such an arrangement under the authority of the Agricultural Marketing Agreement Act."

With respect to the provisions of the Order establishing minimum prices for milk, the Court points out, 307 U.S. at page 554, 59 S.Ct. at page 1004:

"That the minimum price each handler should pay for milk is fixed by a formula * * *. The handlers are required to file reports as to their receipts and utilization of milk of the various classes. It should be understood, however, that this minimum price is not the amount which the producer receives but the price level or so-called 'value' from which is calculated the actual amount in dollars and cents which he is to receive. * * * [A] uniform price is computed and it is this uniform price which the producer is actually paid by the proprietary * * * handlers. The uniform price is determined by a computation which in substance multiplies the amount of milk (classified according to its use) received by all handlers, less certain quantities of milk permitted to be deducted, by the minimum prices fixed * * * for the different classes of milk. From the result various payments and reservations are deducted and the remainder is divided by the total quantity of milk received. To equalize, handlers pay into the producer settlement fund. * * * When the handlers' purchased milk multiplied by the minimum price is less than when it is multiplied by the uniform price, the producer settlement fund pays them the difference for distribution to their producers. These provisions give uniform prices to all producers, * * ."

There will be noted in the foregoing quotation the phrase "handlers' purchased milk" as the multiplicand which, times the minimum price, results in a product constituting the handler's net pool obligation. The plaintiffs at bar seize upon this word "purchased" as the principal basis for their contention that their own-produced milk should not figure in the calculation of their respective net pool

obligations. The Court, in Rock Royal was also called upon to construe the word "purchased" in determining whether a cooperative of producers was required to pay into the producer settlement fund. The Court determined that this cooperative, although marketing milk under an agency contract with its members, was a handler as defined in the Act and in the Order, and therefore, was obligated to pay into the fund. That the cooperative was of the agency type, acting for the producer members, did not, in the Court's opinion, eliminate its contributive obligation. At page 579, of 307 U.S., at page 1016 of 59 S.Ct. (of Rock Royal), the opinion points out:

"It is obvious that the use of the word 'purchased' in the Act, Section 8c(5) (A) and (C), would not exclude the 'sale' type of cooperative. When Section 8c(5) (F) was drawn, however, it was made to apply to both the 'sale' and 'agency' type without distinction. This would indicate there had been no intention to distinguish between the two types by (A) and (C). The section which authorizes all orders, Section 8c(1), makes no distinction. The orders are to be applicable to 'processors, associations of producers, and others engaged in the handling' of commodities. The reports on the bill show no effort to differentiate. Neither do the debates in Congress. * * * As here used, the word 'purchased' means 'acquired for marketing.' Subsection (A) *cannot be construed as freeing agents, cooperative or proprietary, from the requirement to account at the minimum prices for milk handled.*" (Emphasis supplied.)

Elm Spring Farm, Inc. v. United States, 1 Cir., 1942, 127 F.2d 920, was an action to enforce compliance with Order No. 4, covering the Greater Boston Marketing Area, upon a cooperative handling milk produced on farms operated under contract by "herdsmen". In this case, the reliance of the cooperative upon a narrow reading of §§ 8c(5)

(A)/(E) of the Act was held unwarranted. At page 927 of that opinion, the Court said:

"These sections, which delimit the contents of orders to be issued under the Act, refer to milk 'purchased' from producers by handlers, and 'prices' to be paid by handlers for milk so purchased. The argument is as follows: 'Nothing in the language of the Act anywhere modifies the ordinary meaning of these words or authorizes an order to contain any monetary provisions applicable to a person, i. e., in this instance, a corporation, engaged in the distribution of milk given by its own cows. In such a case it is manifestly impossible for a "purchase" to take place, with respect to milk which has been the property of such person, not merely from the instant of its being drawn into the pail, but even from the very earliest instant in its process of creation in which it could be recognized as having any existence whatsoever.' This contention is foreclosed by United States v. Rock Royal Co-Operative, Inc., 307 U.S. 533, 578-581, 59 S.Ct. 993, 83 L.Ed. 1446, * * * ."

A more recent decision construing the phrases "purchased from producers" and "purchased by handlers" in the light of the other provisions of the Act, is to be found in Shawangunk Cooperative Dairies, Inc. v. Jones, 2 Cir., 1946, 153 F.2d 700. That case also dealt with Order No. 27 before its scope was extended to include the northern New Jersey area. At page 704 of that opinion, in disposing of the contention that only milk purchased by a handler need be considered in computing the handler's net pool obligation, the Court said:

"Plaintiff points out that the statute, * * * in prescribing the terms of milk orders, * * * 'purchased from producers' and 'purchased by handlers.' 7 U.S.C.A. § 608c(5) (A, C, D, E). But since the Rock Royal case, * * * determined that the word 'purchased'

was not to be literally construed, but was to read as the equivalent of the alternative statutory phrase 'acquired for marketing,' and since the 'acquired' of the statute can mean no more than the 'received' of the regulation, plaintiff's contention is reduced to its claim that it did not acquire the milk *for marketing.* With this, however, we cannot agree, for since no milk can enter the New York market without prior reception at an approved plant, plaintiff's acts here were indispensable to the total routing of the milk from the farms of the producers to its destination in New York City."

I accept the construction of the word "purchased" as applied in the Rock Royal case, supra, and those decisions which have followed it. I therefore conclude that the provisions of § 927.65 of Order No. 27 are fully in accord with the enabling statute, and that the refusal of the Secretary to exempt the plaintiffs from the obligation to include their own-produced milk in the calculation of their net pool obligations, was in all respects legal and within his statutorily delegated power.

### Conclusions

In the proceedings for the enlargement of the territory of Order No. 27 to include northern New Jersey within the milk marketing area thereof, I find no unconstitutional lack of due process nor violation of the provisions of the applicable rules of the Secretary of Agriculture or of the provisions of the Administrative Procedure Act.

I find in the record before the Secretary substantial evidence justifying his promulgation of Order No. 27 in its present comprehensive form and his determination that northern New Jersey is appropriately includable with metropolitan New York and the other counties of that State named in § 927.3 of the Order, in a single milk marketing area.

I further conclude that the provisions of § 927.65 of the Order regulate own-produced milk of handlers within the area, and that the authority for such regulation is to be found in the Agricultural Marketing Agreement Act of 1937.

For these reasons defendant's motions for summary judgment are granted, and the cross-motions of the plaintiffs for summary judgment are denied.

An order may be presented in conformity with these conclusions.