(Reap. Dec. 10569)

THE HOENIG PLYWOOD CORPORATION v. UNITED STATES

Entry No. 839964.

(Decided July 24, 1963)

*Sharp & Bogan* (*James R. Sharp, Myron Solter*, and *Alan D. Hutchison* of counsel) for the plaintiff.

*John W. Douglas*, Assistant Attorney General (*Daniel I. Auster* and *Richard E. FitzGibbon*, trial attorneys), for the defendant.

*Robert C. Keck* (*Valentine A. Weber, Jr.*, and *MacLeish, Spray, Price & Underwood* of counsel) a*s amicus curiae*.

Rao, Judge: In this appeal for reappraisement, plaintiff is seeking to upset a finding of dumping made by the Assistant Secretary of the Treasury, pursuant to the provisions of the Antidumping Act of 1921 [1] (19 U.S.C., § 160 (May 27, 1921, ch. 14, § 201, 42 Stat. 11; June 17, 1930, ch. 497, title IV, § 651(d) (5), 46 Stat. 763)), and promulgated on August 26, 1954, 89 Treas. Dec. 197, T.D. 53567, in respect to hardboard imported from Sweden. Said finding reads as follows:

---

[1] Insofar as here pertinent, the Antidumping Act of 1921 provides as follows:

DUMPING INVESTIGATION

Sec. 201. (a) That whenever the Secretary of the Treasury (hereinafter in this Act called the "Secretary"), after such investigation as he deems necessary, finds that an

*Antidumping—Hardboard from Sweden*

The Acting Secretary of the Treasury makes a finding of dumping with respect to hardboard from Sweden

TREASURY DEPARTMENT,
*Washington, D.O., August 26, 1954.*

*To Collectors of Customs and Others Concerned:*

After due investigation, in accordance with the provisions of section 201 of the Antidumping Act, 1921 (19 U.S.O. 160), I find that the industry manufacturing hardboard in the United States is likely to be injured by reason of the importation into the United States of hardboard from Sweden, and that hardboard from Sweden is being sold and is likely to be sold in the United States at less than its fair value. (Sec. 201, 42 Stat. 11; 19 U.S.O. 160.)

(643.3)

H. CHAPMAN ROSE,
*Acting Secretary of the Treasury.*

[Filed with the Division of the Federal Register September 2, 1954, 8:45 a.m.]

The objection raised is that the finding of dumping lacks validity by reason of the failure of the Secretary of the Treasury to comply with the provisions of the Administrative Procedure Act of 1946 (5 U.S.C., § 1001 and ff), hereinafter referred to as A.P.A., which, insofar as here applicable, recite the following:

§ 1001. Definitions [A.P.A., § 2].

\* \* \* \* \* \* \*

(a) Agency.

industry in the United States is being or is likely to be injured, or is prevented from being established, by reason of the importation into the United States of a class or kind of foreign merchandise, and that merchandise of such class or kind is being sold or is likely to be sold in the United States or elsewhere at less than its fair value, then he shall make such finding public to the extent he deems necessary, together with a description of the class or kind of merchandise to which it applies in such detail as may be necessary for the guidance of the appraising officers.

\* \* \* \* \* \* \*

SPECIAL DUMPING DUTY

SEC. 202. (a) That in the case of all imported merchandise, whether dutiable or free of duty, of a class or kind as to which the Secretary has made public a finding as provided in section 201, and as to which the appraiser or person acting as appraiser has made no appraisement report to the collector before such finding has been so made public, if the purchase price or the exporter's sales price is less than the foreign market value (or, in the absence of such value, than the cost of production) there shall be levied, collected, and paid, in addition to the duties imposed thereon by law, a special dumping duty in an amount equal to such difference.

\* \* \* \* \* \* \*

DUTIES OF APPRAISERS

SEC. 209. That in the case of all imported merchandise, whether dutiable or free of duty, of a class or kind as to which the Secretary has made public a finding as provided in section 201, and as to which the appraiser or person acting as appraiser has made no appraisement report to the collector before such finding has been so made public, it shall be the duty of each appraiser or person acting as appraiser, by all reasonable ways and means to ascertain, estimate, and appraise (any invoice or affidavit thereto or statement of cost of production to the contrary notwithstanding) and report to the collector the foreign market value or the cost of production, as the case may be, the purchase price, and the exporter's sales price, and any other facts which the Secretary may deem necessary for the purposes of this title.

"Agency" means each authority (whether or not within or subject to review by another agency) of the Government of the United States other than Congress, the courts, or the governments of the possessions, Territories, or the District of Columbia. * * *

\* \* \* \* \* \* \*

(c) Rule and rule making.

"Rule" means the whole or any part of any agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or to describe the organization, procedure, or practice requirements of any agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing upon any of the foregoing. "Rule making" means agency process for the formulation, amendment, or repeal of a rule.

(d) Order and adjudication.

"Order" means the whole or any part of the final disposition (whether affirmative, negative, injunctive, or declaratory in form) of any agency in any matter other than rule making but including licensing. "Adjudication" means agency process for the formulation of an order.

\* \* \* \* \* \* \*

§ 1003. Rule making [A.P.A., § 4].

Except to the extent that there is involved (1) any military, naval, or foreign affairs function of the United States or (2) any matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts—

(a) Notice; publication and contents.

General notice of proposed rule making shall be published in the Federal Register (unless all persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law) and shall include (1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved. Except where notice or hearing is required by statute, this subsection shall not apply to interpretative rules, general statements of policy, rules of agency organizations, procedure, or practice, or in any situation in which the agency for good cause finds (and incorporates the finding and a brief statement of the reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

(b) Procedures.

After notice required by this section, the agency shall afford interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity to present the same orally in any manner; and, after consideration of all relevant matter presented, the agency shall incorporate in any rules adopted a concise general statement of their basis and purpose. Where rules are required by statute to be made on the record after opportunity for an agency hearing, the requirements of sections 1006 and 1007 of this title shall apply in place of the provisions of this subsection.

\* \* \* \* \* \* \*

§ 1004. Adjudications [A.P.A., § 5].

In every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing, * * *—

(a) Notice of hearing and issues.

Persons entitled to notice of an agency hearing shall be timely informed of (1) the time, place, and nature thereof; (2) the legal authority and jurisdiction under which the hearing is to be held; and (3) the matters of fact and law asserted. In instances in which private persons are the moving parties, other parties to the proceeding shall give prompt notice of issues controverted in fact or law; and in other instances agencies may by rule require responsive pleading. In fixing the times and places for hearings, due regard shall be had for the convenience and necessity of the parties or their representatives.

(b) Procedure.

The agency shall afford all interested parties opportunity for (1) the submission and consideration of facts, arguments, offers of settlement, or proposals of adjustment where time, the nature of the proceeding, and the public interest permit, and (2) to the extent that the parties are unable so to determine any controversy by consent, hearing, and decision upon notice and in conformity with sections 1006 and 1007 of this title.

* * * * * * *

§ 1009. Judicial review of agency action [A.P.A., § 10].

Except so far as (1) statutes preclude judicial review or (2) agency action is by law committed to agency discretion—

* * * * * * *

(e) Scope of review.

* * * In making the foregoing determinations the court shall review the whole record or such portions thereof as may be cited by any party, and due account shall be taken of the rule of prejudicial error. (June 11, 1946, ch. 324, § 10, 60 Stat. 243.)

The technical aspects of regular appraisement within the valuation provisions of section 402 of the Tariff Act of 1930 are not in issue in this case, nor has it been disputed that the appraiser has correctly determined the "foreign market value" and the "purchase price" for the eventual assessment of dumping duties, within the purview of said Antidumping Act.

In substance, it is the contention of the plaintiff that the function of the office of the Secretary of the Treasury exercised under the Antidumping Act of 1921 is subject to the provisions of the A.P.A.; that a dumping finding is rulemaking, as defined in section 4 of said act; and that the admitted failure to publish in the Federal Register general notice of intention to investigate alleged dumping of hardboard from Sweden renders the finding of dumping invalid.

To the extent that these general propositions of law are urged upon the court at this time, there is an area of identification with the case of *Elof Hansson, Inc.* v. *United States*, 41 Cust. Ct. 519, Reap. Dec. 9212, reversed, *Same* v. *Same*, 43 Cust. Ct. 627, A.R.D. 114, reversed, *United States* v. *Elof Hansson, Inc.*, 48 CCPA 91, C.A.D. 771, certiorari denied, 368 U.S. 899, and, by reason thereof, the record in the

cited case was, upon application of counsel for defendant, incorporated into the instant record.

Initial consideration of these contentions by the writer of this opinion as the single judge sitting in reappraisement in the incorporated case led to the conclusion that the actions of the Secretary of the Treasury under the Antidumping Act of 1921, as amended, were not subject to the provisions of the A.P.A.; that, accordingly, there was no occasion to consider whether or not the exercise of the power to issue a dumping finding was rulemaking or adjudication, within the contemplation of the A.P.A.; and, therefore, that the failure to publish in the Federal Register, as required by section 4(a) of said act, had no effect upon the validity of the finding.

By reference to the legislative history of both the Antidumping Act of 1921 and the A.P.A., this court reasoned that the power of the Secretary of the Treasury under the Antidumping Act to conduct "such investigation as he deems necessary" and to publish his finding "to the extent he deems necessary" was so broad a delegation of discretionary authority as to negative any intention on the part of Congress to curtail it by implication alone in the enactment of the A.P.A.

This approach to the principles involved was rejected by the third division of this court, which held that the A.P.A. was applicable to antidumping procedures; that, in the exercise of the functions therein involved, the office of the Secretary of the Treasury was an administrative agency; that his finding of dumping is rulemaking; that publication in the Federal Register, in accordance with the provisions of section 4(a) of the A.P.A., was a condition precedent to the issuance of a valid finding of dumping, and that failure to so publish was a jurisdictional defect, not cured by actual notice to any or all of the parties involved, citing *Hotch* v. *United States*, 212 F. 2d 280.

In its consideration of the issues in this case, the Court of Customs and Patent Appeals did not deem it necessary to determine whether or not the A.P.A. governed the actions of the Secretary of the Treasury under the Antidumping Act of 1921, for it was of opinion that, even if it did, appellee therein, "having actual notice of the pendency of the investigation by the Secretary of the Treasury under the Antidumping Act of 1921, and having participated actively and without objection in the investigation preceding the finding of dumping, thereby waive[d] its right to rely upon the asserted procedural irregularity to nullify the finding of dumping."

The opinion of the court sets forth at some length the extent to which Elof Hansson, Inc., was apprised of the institution and pendency of the investigation of alleged dumping of Swedish hardboard and of the nature of the participation of importers generally, including Elof Hansson, Inc., their attorneys, representatives of foreign embassies, and domestic producers in the investigation which lasted

for some 18 months from the date of the filing of the petition by the Hardboard Association on March 31, 1953. It also adverts to the fact that, as of October 13, 1953, by direction of the Acting Commissioner of Customs, all importers of Swedish hardboard received notices of withheld appraisement, customs Form 6459, wherein they were advised of the pendency of an investigation to determine whether or not merchandise was being imported in violation of the Antidumping Act of 1921.

Noting that "[a]t no time during the course of the entire investigation was any issue raised before the Secretary, either directly or through the Customs Bureau, of any procedural irregularities in the investigation based on alleged non-compliance with the A.P.A. provisions requiring the publication in the Federal Register of notice of 'rule making' proceedings," the court went on to hold, under authority of *United States* v. *Tucker Truck Lines*, 344 U.S. 33, that the omission to publish was a procedural irregularity and that the absence of timely objection at the administrative level was fatal to the contention that "the procedural irregularity resulted in the loss of agency jurisdiction so that the order is totally void."

The case of *Hotch* v. *United States, supra,* was distinguished on the following grounds:

In the *Hotch* case, as distinguished from the instant situation, Hotch had no opportunity to object to the procedures followed by the Secretary of the Interior prior to the criminal action against him. Hotch had no notice of and did not participate in the "rule-making" hearings. The issue upon which our decision turns, viz, whether a participant in administrative proceedings can raise a procedural objection for the first time on appeal to the courts, was never before the court in the *Hotch* case and, therefore, was not decided. Thus that case is not pertinent in determining the matters here in issue.

It is significant to observe, at this point, that the Court of Customs and Patent Appeals did not make an affirmative finding that a dumping order is rulemaking, within the provisions of the A.P.A., and took the precaution of mentioning that its discussion of the effects of the failure of the Secretary of the Treasury to publish notice of investigation of dumping of Swedish hardboard in the Federal Register was predicated upon *"appellee's theory* that the finding of dumping was 'rule making.' " [Italics supplied.]

It continues to be the view of this member of the court, for the reasons expressed in his decision in the incorporated case, that the provisions of the A.P.A. do not serve to govern the actions of the Secretary of the Treasury in the exercise of his duties under the Antidumping Act of 1921. It does not seem that Congress would twice have amended the dumping law, subsequent to the effective date of the A.P.A., without some reference to the failure of the Secretary of the Treasury, or of the United States Tariff Commission to which

was transferred the injury-finding functions under the Antidumping Act, to comply with the notice and hearing provisions of the A.P.A. Yet, the contrary appears to be the case. In amending the Antidumping Act in the Customs Simplification Act of 1954, the Ways and Means Committee of the House of Representatives issued its report No. 2453, in connection with the bill H.R. 10009, 83d Congress, in which is stated:

> The Committee expects, of course, that the Commission will give interested parties notice of the institution of an injury investigation and will afford them reasonable opportunity to present their views at public hearings.

"Notice" is not defined in terms of publication in the Federal Register, nor is the Commission's power to conduct an injury investigation at all related to the provisions of the A.P.A.

Again, in 1958, when the Antidumping Act was specifically amended to provide for mandatory public notice of a dumping investigation, H.R. 6006, 85th Congress (Act of August 14, 1958, 72 Stat. 583), the House Ways and Means Committee Report No. 1261 stated merely—

> Provision is made by your committee's bill for *mandatory* public notice when there is reason to believe or suspect sales of imported merchandise at a dumping price, and *mandatory* public notice by the Treasury Department and the Tariff Commission of their decisions in dumping cases, whether affirmative or negative, with reasons therefor. [Italics supplied.]

Hearings before the House Committee on Ways and Means, 85th Congress, first session, on amendments to the Antidumping Act of 1921, reveal that the Committee's action in inserting the provision for mandatory public notice was taken after numerous witnesses, including an Assistant Secretary of the Treasury, and representatives of the American and Customs Bar Associations brought to the attention of the Committee the then lack of existing requirement for such notice, but the desirability thereof. The Committee itself observed, in presenting the amendment, that the practice theretofore had been to issue press releases in such cases.

> * * * While in general it is legislative history prior to and at the time of enactment which is most helpful in ascertaining intention, yet, we are not to ignore the legislative history in connection with subsequent congressional consideration of the legislation, incidental to modifying enactments or to reenactments. [*Ellis K. Orlowitz Co.* v. *United States*, 47 Cust. Ct. 583, A.R.D. 136.]

That 12 years after the effective date of the A.P.A. Congress appreciated the need for express provision for mandatory public notice of investigations of suspected dumping, without the slightest indication that the Treasury Department had been violating existing law by failing to publish, is more consistently explained as congressional recognition of the inapplicability of the A.P.A. than as "not a declaration of a new policy, but a more explicit expression of the purpose of the prior law, apparently made necessary by the administrative construc-

tion or misconstruction of that law. *Jordan* v. *Roche*, 228 U.S. 436." *Elof Hansson, Inc.* v. *United States*, A.R.D. 114, *supra*.

Nevertheless, since the division of this court having jurisdiction to review the writer's determinations has already held that antidumping procedures are subject to the A.P.A. as rulemaking functions, and the Court of Customs and Patent Appeals has not affirmatively rejected that holding, it must be assumed, for purposes of this case, that the A.P.A. is applicable to the instant finding of dumping and that publication in the Federal Register was a condition precedent to a proper investigation.

In the present case, counsel for plaintiff has virtually conceded that all importers in the same circumstances as Elof Hansson, Inc., who have had actual notice of the dumping investigation and who, either personally or through counsel, have participated in the proceedings without raising objection as to the failure to publish notice in the Federal Register, are within the rule of the *Hansson* case, *supra*, and are estopped from relying upon any procedural irregularity in the finding to assert its invalidity. It is contended, however, that the present plaintiff is neither chargeable with notice of the investigation, nor included within the group which participated in the proceedings. It is claimed that this plaintiff had no opportunity to object to the irregularity of failure to publish and, therefore, may not be said to have waived its right to rely on the omission, or to assert that the dumping finding was invalid.

Before considering plaintiff's status and the effect as to it of the omission to publish, it must be noted that it may not now be asserted that the dumping finding was totally void. The decision in *United States* v. *Elof Hansson, Inc.*, *supra*, is explicit authority to the contrary. Assuming, arguendo, that plaintiff's position suffices to isolate it from the ambit of the decision, it would have succeeded only in establishing that the importation at bar was not subject to the dumping finding.

It appears from the instant record that, during the months of October and November 1950, plaintiff was, by correspondence with a Swedish manufacturer of hardboard (defendant's collective exhibit A), negotiating for the subsequent importation of that product. The Swedish company, in a letter, dated October 27, 1953, indicated its reluctance to make any firm commitments until such time as a "final and positive decision" was made by our "authorities" on antidumping duties. Before replying to this communication, the president of plaintiff appears to have sought information in the matter either from the National Council of Importers or its own attorneys, and, in a

letter, dated November 2, 1953, advised the Swedish company as follows:

We thank you for your letter of October 27, 1953 and wish to clarify the position with regards to the investigation by our authorities as follows:

It is true that an investigation is in progress but your information that importers would have to deposit a guarantee of 200% of the import value of imported boards is, however, erroneous. The position is this, importers of any merchandise imported to the United States have to deposit a "bond" with the entry of custom duty. This bond is a guarantee that the importer will pay additional duty whenever the custom authorities come to the conclusion that the fob foreign port price is not correct. This is a customary risk every importer has to assume.

The position has now changed in so far as the investigations in progress are increasing this risk.

As per our opinion, the investigations have been initiated by the American Masonite Corp. more or less to give importers a warning and impose a hardship upon them. These investigations can be concluded tomorrow but it is more likely that they will not be concluded for a long period.

We are not prepared to drop imports for an uncertain period which may last a long time. On the other hand, we would like to be in a position to judge what kind of chances we are going to take. In this respect, you can be of help to us.

It is the duty of the investigators to find out if the fob prices quoted by you for export to the United States are the same as those quoted to other countries such as England, Germany, etc. The investigator has, furthermore, to find out if and by what rate the prices quoted for export to the United States are lower than those freely offered on your domestic market.

Therefore, should you be kind enough to give us full information on these two positions we will be able to judge our risks in placing orders with you at this junction.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

Although the instant merchandise was imported on December 31, 1956, two prior shipments of Swedish hardboard were entered by plaintiff on April 5, 1954, and notices of withheld appraisement, issued pursuant to direction of the Acting Commissioner of Customs, dated October 15, 1953 (plaintiff's exhibit 2), were forwarded to plaintiff on August 9, 1954, and admittedly were received a day or two thereafter. These indicate that appraisement was being withheld, pending investigation as to possible violation of the Antidumping Act of 1921.

On April 13, 1954, in connection with one of the April 5 entries, the United States examiner of hardboard at the port of New York visited the importer for the purpose of seeking information, *inter alia,* as to plaintiff's relationship to its exporter, its knowledge of the wholesale foreign value of hardboard, and of prices to countries other than the United States, and whether or not any charges or rebates were included in the exporter's sales price.

The record is not clear as to whether or not plaintiff's president was advised prior to his being questioned on the aforementioned matters

that the information was being sought in connection with the suspected dumping of hardboard. Both the examiner and plaintiff's president were testifying some 8 years after the event, and their recollections were understandably hazy. Examiner Geller was of the belief that, prior to calling at plaintiff's establishment, he had discussed the proposed questionnaire with Mr. Hoenig on the telephone and had stated that its purpose was to ascertain whether his company was an exporter or importer under the Antidumping Act, in view of the fact that there was an inquiry pending to determine whether there was any dumping of Swedish hardboard. He had no absolute recollection of having so advised Mr. Hoenig, but thought he had, since it was customary for him to so state to all importers of hardboard. Mr. Hoenig, on the other hand, was fairly certain that he had not been told that the questionnaire related to dumping, since if he had he "would have immediately refused to talk further without asking counsel, legal, and the attorney, because I am afraid of this. I know dumping can be very dangerous for an importer."

Although the questionnaire itself does not indicate its purpose, it would appear that Mr. Hoenig, who had so very carefully explained to the exporter the necessity of obtaining information as to prices to countries other than the United States, and as to whether prices for exportation to the United States were lower than those freely offered on the Swedish home market, so as to be able "to judge our risks in placing orders with you at this junction," might well have understood that the questions propounded by Mr. Geller had some relationship to dumping. Accordingly, this court is inclined to conclude that the examiner's recollections more accurately correspond with what actually occurred and that the importer was, in fact, officially apprised, as of April 13, 1954, that an antidumping investigation was in progress.

In any event, it can not seriously be disputed that plaintiff had actual knowledge of the pendency of the investigation for some 10 months prior to the promulgation of the finding. It is equally true, however, that plaintiff did not actively participate in the investigation to any greater extent than to answer the questions asked by Mr. Geller.

Counsel for plaintiff asserts that since the Hoenig Plywood Corporation did not participate in the rulemaking procedures, it had no opportunity to make timely objection and did not waive its right to rely upon the procedural irregularity of failure to publish in the Federal Register.

Counsel for defendant and *amicus curiae* argue that importer is estopped from complaining of the procedural irregularity, since it did participate in the investigation by answering the examiner's questions and, further, had ample opportunity to have interposed timely objection to the failure to publish.

Under all of the circumstances of this case, it is doubtful that the role played by plaintiff in answering some 12 questions asked by an examiner at the port of New York constituted participation in the antidumping investigation. Of course, it might have objected at that time to lack of formal notice in the Federal Register, but the relationship of the questionnaire to the investigation itself might well have escaped minds more legally alert than that of Mr. Hoenig. The question, therefore, arises whether actual notice, coupled with a mere opportunity to participate in administrative deliberations, constitutes a waiver of any procedural irregularities not specifically objected to.

Most of the cases to which counsel for defendant or *amicus curiae* has invited our attention stand for the proposition that actual notice, together with some form of participation, with an accompanying opportunity to bring the procedural irregularity to the attention of the administrative agency, precludes a party from complaining of noncompliance with a statutory provision for public notice. See and compare *Technical Radio Laboratory* v. *Federal Radio Commission*, 36 F. 2d 111; *Owensboro on the Air* v. *United States*, 262 F. 2d 702; *Amerada Petroleum Corp.* v. *Federal Power Commission*, 231 F. 2d 461; *Air Line Pilots Association International* v. *Civil Aeronautics Board*, 215 F. 2d 122; *Federal Security Administrator* v. *Quaker Oats Company*, 318 U.S. 218; *Ideal Farms, Inc.* v. *Benson*, 181 F. Supp. 62; *Florida Citrus Commission* v. *United States*, 144 F. Supp. 517; *Royce* v. *Rosasco*, 159 Misc. 236, 287 N.Y.S. 692; *Standard "Tote" Inc.* v. *Ohio State Racing Commission*, 121 N.E. 2d 463.

However, the trend of decisions construing the publication requirements of the A.P.A. has been toward a departure from the strict rule of *Hotch* v. *United States*, *supra*, that "if the rule itself is not published, it follows that it has not been issued; and if a rule has not been issued, it has no force as law." *United States* v. *Elof Hansson, Inc.*, *supra*, is part of that liberalizing trend in expressing the view that "the failure of the Secretary of the Treasury to publish the notice required by Section 4 [§ 1003] of A.P.A. was a procedural irregularity." *United States* v. *Aarons*, 310 F. 2d 341, is a more recent instance of a similar attitude. In construing section 3(a) (5 U.S.C., § 1002) of the A.P.A., relating to publication of information, rules, opinions, orders, and public records, the court expressly held that failure to publish, as required by the language of that provision, is without consequence as against a person having actual knowledge.

Indeed, it would seem to flow naturally from the disposition to treat a failure to publish as a procedural irregularity to conclude that publication which, at best, provides no more than constructive notice (*New York* v. *N.Y., N.H. & H.R. Co.*, 344 U.S. 293) is no indispensable requirement if factual notice of proposed rulemaking is established.

By virtue of inquiries made by its president, as a result of correspondence with its shipper, the receipt of notices of withheld appraisement, and the questionnaire propounded by Examiner Geller, a clear showing has been made that plaintiff was actually apprised of the pending dumping investigation. Months elapsed between the first affirmative instance of knowledge attributable to the plaintiff and the culmination of the investigation during which timely objection to the failure to publish might have been taken. Plaintiff showed no disposition to bring to the attention of the appropriate authorities the procedural irregularity upon which it now relies to upset a finding resulting from a most thorough and painstaking investigation. This is "clearly an afterthought, brought forward at the last possible moment to undo the administrative proceedings without consideration of the merits and can prevail only from technical compulsion irrespective of considerations of practical justice." *United States* v. *Tucker Truck Lines, supra.*

This court is of opinion that actual notice, coupled with a reasonable opportunity to participate in administrative proceedings, affords a party substantially the same degree of protection as published notice might have provided, and, in the absence of timely objection to procedural irregularities, the administrative finding must be allowed to stand.

In any event, the present record is without a scintilla of evidence to establish in what respect plaintiff has been prejudiced by the failure of the Secretary of the Treasury to publish notice of the proposed investigation. Section 10(e) of the A.P.A. (5 U.S.C., § 1009(e)) provides that upon judicial review of agency action "due account shall be taken of the rule of prejudicial error." The rule of prejudicial error is one founded upon the common law principle that an appellate tribunal will not reverse a trial court's harmless errors. "There must be some injury to the party, to make the matter generally assignable as error." *Greenleaf's Lessee* v. *Birth,* 5 Pet. (30 U.S.) 132. Technical errors, having no substantial effect upon the ultimate result of a case, are not such as can be considered by a reviewing court in the disposition of an appeal. *Thornley & Pitt et al.* v. *United States,* 19 CCPA 221, T.D. 45325; *U.S. Vitamin Corp.* v. *United States,* 43 CCPA 44, C.A.D. 607; *State Farm Mutual Automobile Insurance Co.* v. *Bourne,* 220 F. 2d 921.

All that the publication of notice would have afforded plaintiff in the instant case was knowledge that the Secretry of the Treasury was preparing to investigate suspected dumping of Swedish hardboard. This was knowledge that plaintiff actually acquired by other means in ample time to make known its position with respect to a finding of dumping. The published notice would not have advised of any

time or place set for public hearing, since public hearing was not required by the antidumping law, and none was contemplated.

It does not appear that plaintiff was ever denied an opportunity to participate in the investigation, nor has it been shown that if it had any different result might have ensued. *Cf. Watson Bros. Transportation Co.* v. *United States,* 180 F. Supp. 732. As pointed out by our appellate court in the incorporated case, a thoroughgoing inquiry into all phases of the importation of Swedish hardboard was conducted over an extended period of time. Presumptively, all arguments against the issuance of a finding of dumping were duly presented and considered. The instant record does not set forth any new facts or other contentions which might have been brought out during the course of the investigation to change the conclusion reached by the Secretary of the Treasury that importations of Swedish hardboard were likely to injure the American hardboard industry.

For the reasons hereinabove stated, this court makes the following findings of fact:

1. The merchandise involved in this case consists of hardboard, exported from Sweden on December 4, 1956, and entered at the port of New York on December 31, 1956, under entry No. 839964.

2. The appraisement of said merchandise within the provisions of section 402 of the Tariff Act of 1930 is not contested.

3. Pursuant to a finding of dumping of the Acting Secretary of the Treasury, issued on August 26, 1954 (89 Treas. Dec. 197, T.D. 53567) and published in the Federal Register on September 3, 1954 (19 F.R. 5631), and in accordance with the provisions of the Antidumping Act of 1921, the appraiser determined the "foreign market value" and the "purchase price" of the subject merchandise.

4. The appraiser's determination of said value and price, respectively, are not here challenged.

5. In issuing his finding of dumping, the Acting Secretary of the Treasury did not follow the specific procedure prescribed in section 4(a) of the Administrative Procedure Act of 1946 (5 U.S.C. § 1003 (a)) for publication in the Federal Register of notice of intention to investigate suspected dumping of Swedish hardboard.

6. On October 15, 1953, the Acting Commissioner of Customs directed that appraisements be withheld on all unappraised entries of hardboard from Sweden.

7. This importer received two notices of such withholding on or about August 11, 1954.

8. This importer had actual knowledge of the investigation of suspected dumping of Swedish hardboard from November 2, 1953, but did not participate in said proceedings nor object to the failure of the

Secretary of the Treasury to comply with the publication provisions of said section 4(a) of the A.P.A.

9. There is no evidence of record to show in what respect this importer's position would have been different, if the Secretary of the Treasury had published notice of the contemplated investigation in the Federal Register.

The court, therefore, concludes that—

1. The appraisement of the instant merchandise within the provisions of section 402 of the Tariff Act of 1930 is affirmed.

2. The failure of the Secretary of the Treasury to comply with section 4(a) of the A.P.A. was a procedural error.

3. Actual notice, coupled with a reasonable opportunity to participate in the antidumping investigation, was the substantial equivalent of published notice.

4. The failure to voice timely objection to the procedural error of failure to publish notice of the contemplated investigation constituted a waiver of such objection.

5. Agency findings may not be upset in the absence of prejudicial error.

6. The finding of dumping with respect to hardboard from Sweden is valid.

7. The values returned by the appraiser under said Antidumping Act of 1921, with respect to the merchandise at bar, are proper and are hereby affirmed.

Judgment will be entered accordingly.